*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 12a0381p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――

AMINATA DIENG, OUSSEYNOU N'DIAYE LO,
                    *Petitioners*,

    *v.*                                                    No. 10-3497

ERIC H. HOLDER, JR., Attorney General,
                    *Respondent*.

On Petition for Review of an Order
of the Board of Immigration Appeals.
Nos.: A88-197-111; A93-428-046.

Argued: November 16, 2011

Decided and Filed:  November 8, 2012

Before:  NORRIS, SUTTON, and GRIFFIN, Circuit Judges.

―――――――――

**COUNSEL**

**ARGUED:** William J. Kovatch, Jr., Alexandria, Virginia, for Petitioners.  Lisa Morinelli, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** William J. Kovatch, Jr., Alexandria, Virginia, for Petitioners. Lisa Morinelli, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

―――――――――

**OPINION**

―――――――――

GRIFFIN, Circuit Judge.  Lead petitioner Aminata Dieng and her husband Ousseynou N'Diaye Lo are natives and citizens of Senegal.  They seek review of the Board of Immigration Appeals' ("BIA's") final order of removal, denying their applications for asylum, withholding of removal, and protection under the United Nations Convention Against Torture ("CAT"), 8 C.F.R. §§ 1208.16(c), 1208.17. Because reasonable and substantial evidence supports the BIA's finding that Dieng does

1

not harbor a well-founded fear of persecution for herself or her daughters—based on the prospect of being subjected to female genital mutilation ("FGM") in Senegal—we deny the petition for review.

I.

Petitioner Lo entered the United States in 1997 with a non-immigrant student visa for the purpose of attending the University of Tennessee. He reunited with Dieng, whom he first met in Senegal in 1994, when she used a false passport to enter the United States in September 2003. They married in November 2005 and their daughter Mame was born in April 2006 in Virginia. Dieng has another daughter, Mariame, who was born in Gambia in January 2003 as a result of Dieng's out-of-wedlock relationship with another Senegalese citizen. Since her birth, Mariame has remained in Gambia with her maternal grandmother.

Petitioners submitted their affirmative asylum application in March 2007. The U.S. Citizenship and Immigration Service denied the application and placed petitioners in removal proceedings. On November 8, 2007, Dieng and Lo appeared before an immigration judge ("IJ"), admitted all allegations in the Notices to Appear, and conceded removability.[1] Dieng requested asylum, withholding of removal, and protection under the CAT, with Lo as a derivative applicant. Dieng alleged persecution based on her race, religion, and membership in a particular social group (the Fulani ethnic group), stemming from past unsuccessful attempts by relatives to circumcise her, and her fear that if removed to Senegal, she and her daughters would be at risk of being subjected to FGM.

On August 26, 2008, a removal hearing was held before an IJ in Cleveland. Dieng and Lo, represented by counsel, both testified. Dieng, then twenty-five years old, stated that she was born and raised in Dakar, Senegal, as a member of the Toucouleur

---

[1] In the Notices to Appear, Dieng was charged with being subject to removal pursuant to 8 U.S.C. § 1182(a)(6)(A)(i), as an alien present in the United States without being admitted or paroled; Lo was charged under 8 U.S.C. § 1227(a)(1)(C)(i), for violating the conditions of his non-immigrant status by failing to attend the university.

(Halpularen) tribe and the Fulani ethnic group, which commonly practices FGM. She testified that her older sister died at the age of three from an infection caused by circumcision. The FGM was performed by relatives with the consent of Dieng's parents, who allowed it because it was "part of the culture." However, in the wake of her sister's death, Dieng's parents opposed the practice of FGM and their relatives' attempts to circumcise Dieng.

Dieng recalled two such attempts at FGM—once when she was approximately three years old, and years later, in May 2001, when she was eighteen or nineteen. On both occasions, Dieng's parents intervened successfully to stop the circumcision, but not without physical confrontations resulting in minor injuries to Dieng, threats, and a deterioration in family relations. Neither of these altercations was reported to the police, and Dieng remained at her parents' house without further incident until April 2002 when, unmarried and pregnant with Mariame, her father advised her to leave the country. Dieng and her mother traveled to Banjul, Gambia, and stayed there with a family friend. In January 2003, Dieng gave birth to Mariame, who has remained in Gambia with Dieng's mother. Allegedly fearful that her relatives would find her in Gambia, Dieng traveled to the United States in September 2003 and gained entry through the use of a false passport.

Dieng testified that Lo, from a different area in Senegal, is a member of the Wolof ethnic group, which does not practice FGM. Dieng stated that their daughter Mame is considered to be a Wolof and, therefore, Wolof customs would govern Mame's circumstances. Dieng testified that if she and Lo were deported to Senegal, Mame would accompany them "because I don't have anybody to keep my daughter [in the United States]."

Significantly, Dieng testified that if she returned to Senegal, it would be "too late for them to have me circumcised now, since I've been married and now have two children. I'm worried about my two girls. And they can act in a way that it can break

my marriage, because I'm married now."**2** Her attorney then asked her what she thought would happen to her two daughters, and she answered, "My two girls are little, and they [Dieng's relatives] can circumcise them." Even though Dieng's Fulani relatives lived in a rural area a considerable distance from Dakar, she claimed that there was no place in Senegal where she would feel safe because they could find her anywhere, and the police would not provide protection.

In his testimony at the hearing, Lo stated that when Dieng first arrived in the United States, she told him that she moved to avoid FGM and that she was afraid to return to Senegal. Lo testified that in the event of their deportation, he preferred not to leave Mame behind in the United States, even though Lo's brother was a United States citizen, living in Virginia, who could "probably" care for Mame. Despite his acknowledgment that the Wolofs do not practice circumcision, Lo thought that Mame was at risk of being circumcised in Senegal; but when questioned as to who would attempt the FGM, he answered, "I have—honestly, I don't know. I would say the first person who laid hands on her." Like Dieng, he testified that there was no part of Senegal where his family could relocate safely because extended family members who practiced FGM would find and circumcise Mame. Lo acknowledged that he could report any FGM attempts to the Senegalese police, but "they won't be able to do anything about it, because it's a cultural thing."

The parties proffered various reports and articles that addressed the current rate of FGM in Senegal including, *inter alia*, the U.S. Department of State's reports entitled *Senegal: Report on Female Genital Mutilation (FGM) or Female Genital Cutting (FGC)* (July 1, 2001) (the "FGM Report"); and *Senegal, Country Reports on Human Rights Practices—2007* (released on Mar. 11, 2008) (the "2007 Country Report"). Overall, the FGM Report estimated that approximately twenty percent of the female population of Senegal had undergone FGM, with higher rates among the rural Halpularen (Peul and Toucouleur) ethnic groups.

---

**2**Dieng explained that her relatives might not acknowledge her marriage to Lo and might try to give or marry her to someone else. She added that Lo would not permit this to occur.

At the conclusion of the removal hearing, Dieng withdrew her contention, originally set forth in her asylum application, that she had suffered persecution on account of her race and religion, and limited her claim to alleged persecution on the basis of her membership in a particular social group, i.e., her affiliation with the Fulani tribe, which practices FGM.

The IJ issued an oral decision finding petitioners removable as charged and denying all relief. As a preliminary matter, the IJ determined that petitioners' asylum application was time-barred under 8 C.F.R. § 1208.4(a)(2). Next, considering their request for withholding of removal, the IJ found that although petitioners were credible witnesses,[3] Dieng failed to demonstrate past persecution or a well-founded fear of future persecution based upon the threat of FGM to herself and her daughters. *See generally* 8 C.F.R. §§ 1208.13(b)(1), 1208.16(b)(1)(i). Finally, the IJ held that the evidence presented did not qualify petitioners for relief under the CAT. In lieu of a removal order, the IJ granted petitioners' request for voluntary departure.

Petitioners' subsequent appeal to the BIA was unavailing. In its written order issued on March 25, 2010, the BIA held that petitioners demonstrated changed circumstances with the birth of their daughter Mame in April 2006 that materially affected their eligibility for asylum, and because the asylum application was filed within a reasonable period after her birth, it was timely filed under 8 C.F.R. § 1208.4(a)(4). Further, contrary to the IJ's findings, the BIA found that Dieng established past persecution due to her membership in a particular social group, based upon her credible testimony that her Fulani relatives twice attempted to subject her to FGM.

---

[3]However, the same cannot be said for the translator who translated several documents that petitioners submitted as exhibits. The IJ determined that at least one of these documents—an English-language version of the death certificate for Dieng's sister (which specified her cause of death as "vaginal hemorrhage from female genital mutilation," unlike the French-language version, which listed no cause of death)—was clearly incorrect and had been fabricated by the translator. Although the IJ was hesitant to impute this falsity to petitioners, he concluded that the "translator [was], in the judgment of the Court, not worthy of belief and no document translated by him will be considered or given any weight whatsoever." Consequently, in addition to the death certificate, several other exhibits, including letters from Dieng's college-aged cousin (claiming that she had been forcibly circumcised during a return visit to Senegal) and her uncle, were excluded.

However, the BIA held that the government successfully rebutted the resultant presumption of a well-founded fear of future persecution by showing that there had been a fundamental change in circumstances, i.e., Dieng testified that due to her age, marital status, and the birth of her two children, she no longer feared being subjected to FGM. *See* 8 C.F.R. § 1208.13(b)(1)(i)(A). Alternatively, a preponderance of the evidence established that it was reasonable for petitioners to relocate to another area of Senegal to avoid FGM. *See* 8 C.F.R. § 1208.13(b)(1)(i)(B). In this regard, the BIA cited (1) Lo's testimony that he was a member of the Wolof tribe, which does not practice FGM; (2) the dearth of evidence showing that Dieng's Fulani relatives (if still alive) would learn of her whereabouts in Senegal and seek her out to attempt FGM; and (3) the State Department's reports indicating that while the outlawed practice of FGM is common in Senegal, it is not universal.

The BIA also rejected Dieng's separate claim arising from *Abay v. Ashcroft*, 368 F.3d 634 (6th Cir. 2004), that she had a well-founded fear of persecution because her daughters would likely be subjected to FGM if they returned with her to Senegal:

> [I]n [*In re*] *A-K-*, 24 I & N 275 (BIA 2007), we distinguished *Abay* on facts very similar to those now present before us, and concluded that Senegalese parents of a United States citizen daughter could not claim asylum based on their fear that the daughter would be subject to FGM. *Abay*, in contrast, had involved a non-U.S. citizen daughter who faced return, with her parents, to Ethiopia, a country with a far higher prevalence of FGM. The respondents' appellate arguments do not persuade us that the facts in their case are distinguishable from those in [*In re*] *A-K-*, or that the holding in that case should not apply here.

(Footnote omitted.)[4]

The BIA reiterated the reasonable option of relocation to a safe area and further noted that Mame would be considered a member of her father's Wolof tribe, which does not practice FGM. As to Mariame, the BIA found no evidence demonstrating that she faced any threat—past or present—of FGM in Gambia or that she would return with

---

[4]In his oral decision, the IJ similarly distinguished *Abay* from the present circumstances and instead found *In re A-K-* to be persuasive authority.

petitioners to Senegal if they were removed from the United States.  The BIA therefore denied petitioners' applications for asylum and withholding of removal, and found no evidence to support their claim for relief under the CAT.  Accordingly, the BIA dismissed petitioners' appeal.  We granted petitioners' motion to stay removal pending a decision on the merits of their petition for review filed in this court.

## II.

In cases where the BIA has issued a separate opinion, instead of summarily affirming the IJ's decision, we review the BIA's decision as the final agency determination.  *Khalil v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009).  We review the factual findings of the BIA under the highly deferential substantial-evidence standard.  *Id*.  "Under this standard, we will not reverse a factual determination of the IJ unless we find that the evidence not only supports a contrary conclusion, but compels it."  *Ceraj v. Mukasey*, 511 F.3d 583, 588 (6th Cir. 2007) (citation and internal quotation marks omitted); *see also* 8 U.S.C. § 1252(b)(4)(B) ("[T]he administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary[.]").  "The appropriate inquiry is whether the applicable evidence was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed."  *Abay*, 368 F.3d at 637 (citation and internal quotation marks omitted).  The legal conclusions of the BIA are subject to our de novo review, but we will defer to the agency's reasonable interpretations of its own precedents.  *Bi Xia Qu v. Holder*, 618 F.3d 602, 606 (6th Cir. 2010).

Asylum may be granted to an alien who establishes that he or she is a "refugee"—one "who is unable or unwilling to return to . . . [his or her home country] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(B)(i); *see also Pilica* v. *Ashcroft*, 388 F.3d 941, 950–51 (6th Cir. 2004).  "If an individual is eligible for asylum, then the applicant bears the burden of establishing that the favorable exercise of discretion [by the Attorney General]

is warranted." *Cruz-Samayoa v. Holder*, 607 F.3d 1145, 1150–51 (6th Cir. 2010) (citation and internal quotation marks omitted).

An alien who establishes past persecution on account of a statutorily enumerated ground is presumed to have a well-founded fear of future persecution. *Pilica*, 388 F.3d at 950; 8 C.F.R. § 1208.13(b)(1). "[A] moderate interpretation of the 'well-founded fear' standard would indicate that so long as an objective situation is established by the evidence, it need not be shown that the situation will probably result in persecution, but it is enough that persecution is a reasonable possibility." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 (1987) (citation and internal quotation marks omitted). The fear of future persecution must be based on reasonably specific information showing a real threat to individual persecution, not mere assertions of fear of possible persecution or speculative conclusions. *Maypouya v. Gonzales*, 487 F.3d 396, 412 (6th Cir. 2007).

The government can rebut the presumption if, by a preponderance of the evidence, it shows that "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality," or that "[t]he applicant could avoid future persecution by relocating to another part of the applicant's country of nationality . . . and under all the circumstances, it would be reasonable to expect the applicant to do so." 8 C.F.R. § 1208.13(b)(1)(i)(A)-(B); *see also Hussein v. Holder*, 380 F. App'x 474, 481 (6th Cir. 2010). The reasonableness of internal relocation requires the consideration of numerous factors, including "'whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties.'" *Ghanim v. Holder*, 425 F. App'x 463, 467 (6th Cir. 2011) (quoting 8 C.F.R. § 1208.13(b)(3)). State Department reports are generally the best gauge of conditions in foreign countries. *Mullai v. Ashcroft*, 385 F.3d 635, 639 (6th Cir. 2004).

III.

A.

Petitioners first challenge the BIA's finding that the government rebutted the presumption of a well-founded fear of future persecution accorded to Dieng because it has shown a fundamental change in her circumstances, or, alternatively, that they may feasibly relocate to a safe area in Senegal to avoid the FGM threat.  Our review of the evidence does not compel a contrary result.

Unquestionably, "[FGM] involves the infliction of grave harm constituting persecution on account of membership in a particular social group that can form the basis of a successful claim for asylum."  *Abay*, 368 F.3d at 638; *see also Niang v. Gonzales*, 492 F.3d 505, 512 (4th Cir. 2007); *Hassan v. Gonzales*, 484 F.3d 513, 517 (8th Cir. 2007); *Bah v. Gonzales*, 462 F.3d 637, 642 (6th Cir. 2006); *Abebe v. Gonzales*, 432 F.3d 1037, 1042 (9th Cir. 2005) (en banc).  Thus, the fact that Dieng suffered past persecution through the two attempts at FGM by her relatives is not to be discounted given her credible testimony.

Nonetheless, substantial evidence supports the BIA's conclusion that Dieng's personal circumstances have changed, such that her fear of FGM in the future is neither subjectively genuine nor objectively reasonable.  *See Maypouya*, 487 F.3d at 412.  By her own admission, Dieng has effectively "aged out" of the threat of FGM in Senegal. The fact that she is now in her mid-twenties, married to a Wolof, and has given birth to two children eliminates any reasonable possibility that she would be subjected to FGM upon her return to Senegal.

That Dieng's fear is not well founded is borne out by the State Department reports for Senegal.  Although FGM is still practiced in Senegal, despite its criminalization in 1999 by the Senegalese government, the FGM Report estimated that approximately twenty percent of the female population in Senegal has undergone FGM, with ninety percent of these females being between the ages of two and five. The Wolof and Serere ethnic groups, and most Christians, do not engage in FGM, and it is hardly

practiced at all in most heavily populated urban areas.  The practice of FGM is primarily concentrated in rural areas amongst the Halpularen (Peul and Toucouleur) ethnic group. The 2007 Country Report noted that as a result of the government's educational efforts to eradicate FGM, 2,336 out of an estimated 5,000 communities had formally abandoned the practice.

Against this backdrop of FGM's steady decline in Senegal, Dieng does not fit the demographic profile of a woman at risk of FGM.  Her individualized fear of persecution is negated by her age and marital status, her Wolof husband's opposition to FGM, and petitioners' ability to relocate safely to an urban location or region of Senegal where the outlawed practice of FGM is rare.  Dieng's nebulous claim that her relatives could "break" her marriage is speculative at best, as is her belief that her Fulani relatives from a rural area would find her in Senegal's expanse with the purpose of circumcising her.

We therefore agree with the BIA that Dieng's fear that she will fall victim to FGM upon her return to Senegal is not well founded.  *See Gomis v. Holder*, 571 F.3d 353, 360 (4th Cir. 2009), *cert. denied*, 130 S. Ct. 1048 (2010) (denying Senegalese alien's petition for review where "[t]he weight of the record evidence, including her age [29], her education, and the decreased incidences of FGM in Senegal, specifically in Dakar, supports the immigration judge and the BIA's finding that it is not more likely than not that [the alien] will face persecution."); *In re A-K-*, 24 I. & N. Dec. at 277 (citing improved conditions in Senegal with regard to FGM and the feasible relocation of the applicant with his daughters to an area of comparative safety in denying his asylum claim); *but see Seck v. U.S. Atty. Gen.*, 663 F.3d 1356, 1367–68 (11th Cir. 2011) (remanding to the BIA for further consideration of the Senegalese alien's application for withholding of removal where the BIA failed to consider undisputed evidence of specific family conditions that placed the alien and her daughter in greater danger of FGM than what was reflected by the State Department reports).

Since Dieng has failed to meet her burden of proving eligibility for asylum, she necessarily fails to meet the more stringent burden required for withholding of removal. *Lin v. Holder*, 565 F.3d 971, 975 (6th Cir. 2009).  Likewise, her failure to show that it

is more likely than not that she would be tortured if removed to Senegal precludes relief under the CAT.  8 C.F.R. § 1208.16(c)(2).

B.

Although Dieng has failed to show that she will be singled out for persecution, the question remains whether the evidence supports her separate and distinct claim of direct persecution based on her fear that her daughters will be circumcised if they accompany petitioners to Senegal.  Both the IJ and the BIA rejected this claim as lacking a factual basis, as do we.

In support of their argument, petitioners rely upon our court's decision in *Abay,* in which we held that an applicant "can seek asylum in her own right based on a fear that her child will be subjected to [FMG]."  *Abay*, 368 F.3d at 641.  The Ethiopian petitioners, a mother (Abay) and her nine-year-old daughter (Amare), sought review of the BIA's order denying their consolidated applications for asylum and withholding of removal.  *Id.* at 635–36.  Their claim for relief rested upon their common fear that Amare would be subjected to FGM if deported to Ethiopia.  *Id*. at 636.  We reversed the BIA's order and granted the petition, holding that the evidence compelled the conclusion that both Amare's and Abay's fears were well-founded.  *Id.*

The evidence consisted in part of State Department Reports for Ethiopia, which indicated that FGM at that time had not been outlawed and was "nearly universal," with ninety percent of all females subjected to some form of FGM.  *Id*. at 639.  Additional articles and reports established that because FGM was the cultural norm in Ethiopia, females who did not undergo the procedure would be subjected to persecution and social ostracism and would be considered unworthy of marriage.  *Id*.  Further, the testimony introduced at the removal hearing indicated that Abay had been circumcised by her own mother, and that she would be unable to prevent the forced circumcision of any of her daughters, including Amare, by relatives or future husbands and in-laws.  *Id*.

Recognizing that "there is no express statutory authority for a parent to claim 'derivative asylum' based on her child's asylee status," *id*. at 641 (citing 8 U.S.C.

§ 1158(b)(3)),**5** a panel of this court gleaned from BIA decisions "a governing principle in favor of refugee status in cases where a parent and protector is faced with exposing her child to the clear risk of being subjected against her will to a practice that is a form of physical torture causing grave and permanent harm." *Id.* at 642. Applying this principle to Abay's circumstances, our court held:

> Given the evidence in the record that [FGM] is "nearly universal" in Ethiopia; that Abay herself underwent the procedure at a young age; that Abay's mother has already attempted to mutilate Abay's older daughters, who still faced the prospect upon their marriage; that Abay would not be able to override any of her daughters' future husbands or in-law's wishes; and that the government of Ethiopia does not, as a practical matter, enforce laws intended to curb harmful traditional practices, we conclude that a rational factfinder would be compelled to find that Abay's fear of taking her daughter into the lion's den of [FGM] in Ethiopia and being forced to witness the pain and suffering of her daughter is well-founded. Accordingly, we find that Abay is also a "refugee" within the meaning of the Act.

*Id.***6** *But see Niang*, 492 F.3d at 512 (disagreeing with *Abay* that psychological harm, without any accompanying physical harm, can constitute persecution in the context of persecution of a petitioner's child by FGM).

Here, the BIA declined to apply *Abay* to Dieng's case, finding that *Abay* was factually distinguishable. Instead, the BIA followed the rationale set forth in its own post-*Abay* decision, *In re A-K-*, in which the Board denied relief to a Senegalese applicant, a member of the Fulani tribe, who sought asylum or withholding of removal

---

**5**Or, for that matter, withholding of removal. *See Castellano-Chacon v. INS*, 341 F.3d 533, 545 (6th Cir. 2003) ("Unlike an application for asylum, . . . a grant of an alien's application for withholding is not a basis for adjustment to legal permanent resident status, [and] family members are not granted derivative status . . . ."); *Gaziev v. Holder*, No. 11-3595, 2012 WL 3126754, at *3 (6th Cir. Aug. 2, 2012) (unpublished) ("[T]he plain language of [8 C.F.R.] § 1208.16(e) does not create a derivative beneficiary status to applications for withholding of removal . . . .").

**6**Judge Sutton concurred in the judgment only, expressing concerns that

> the majority's opinion accepts two propositions in this area that current law does not support: (1) that women or girls may never be deported to a country where the incidence of FGM within the female population as a whole is high, regardless of the risk that a particular applicant will be subjected to FGM, and (2) that the parents of such children may not be deported either.

*Abay*, 368 F.3d at 643 (Sutton, J., concurring).

based solely on his fear that his United States citizen daughters would be subjected to FGM upon their return with him to Senegal. *In re A-K-*, 24 I. & N. Dec. at 279. In concluding that the petitioner's claim was not viable, the BIA cited two key factual differences that rendered *Abay* inapposite:

> [*Abay*] involved a situation where the daughter of the alien in removal proceedings had no lawful status in the United States and could not legally remain in the country in the event of her mother's removal in order to avoid persecution. Thus, unlike the situation in *Abay*, where the alien parent was "faced with exposing her child to the clear risk" of FGM, . . . the children in the instant matter could avoid this risk altogether by remaining in the United States, which they are legally entitled to do, either by staying with the parent who is not currently in removal proceedings, or through the appointment of a guardian to ensure their welfare until such time as they reach majority. Finally, in *Abay*, the Sixth Circuit determined that the practice of FGM in Ethiopia was "nearly universal," and thus that there was little doubt that the respondent's daughters would undergo the procedure if they accompanied their mother to that country.
>
> By contrast, the State Department's 2005 country report on human rights practices in Senegal indicates that FGM is common only in certain areas of the country. A State Department asylum profile of Senegal also indicates that FGM is not practiced at all by the country's largest social group. Accordingly, it appears that even if the respondent's children were to accompany him to Senegal, they could avoid FGM by relocating to an area of comparative safety.

*Id.* at 277 (citations omitted); *see also Sinayoke v. Holder*, 474 F. App'x 34, 36 (2d Cir. 2012) ("[A]sylum eligibility cannot be based solely on the risk of FGM being performed on a U.S. citizen child, absent the risk of persecution to the applicant individually."); *Niang*, 492 F.3d at 512 (denying withholding of removal based on the psychological harm the petitioner would suffer if her daughter accompanied her to Senegal because "unlike the asylum applicant in *Abay*, Niang's daughter is a U.S. citizen; accordingly, there is no clear probability that Niang's daughter will be subjected to FGM as she could remain in the U.S., albeit without Niang, and avoid any potential persecution"); *but cf. Kone v. Holder*, 620 F.3d 760, 766 (7th Cir. 2010) (remanding case to the BIA to consider whether the threat of FGM to an alien's U.S. citizen child constituted direct persecution of the parents under the CAT).

In its subsequent denial of the petition for review in *In re A-K-*, the Fifth Circuit Court of Appeals underscored the importance of differentiating between derivative and direct claims for asylum:

> Derivative asylum claims typically involve the grant of asylum status to a spouse or minor child (but not a parent) who accompanies an alien already eligible for asylum status, even though the spouse or child might not otherwise be eligible for asylum. *See* 8 U.S.C. § 1158(b)(3). The reverse is presented here: Kane (the parent) seeks asylum or withholding based on the potential hardship that his removal might occasion for his minor children, both of whom hold birthright U.S. citizenship. The difference is significant. In the former, the child's derivative claim flows from the parent's—a result that is expressly contemplated, through statute, by the initial grant of asylum. Under the latter framework, however, which is not contemplated by the INA, an illegal immigrant from a country that practices FGM could "create" a right to remain in the United States via asylum or withholding of removal simply by having a female child at any time during the immigrant's presence here.

*Kane v. Holder*, 581 F.3d 231, 242 n.36 (5th Cir. 2009); *see also In re A-K-*, 24 I & N Dec. at 278 ("Automatically treating harm to a family member as being persecution to others within the family is inconsistent with the derivative asylum provisions, as it would obviate the need for these provisions in many respects.").

The factual distinctions from *Abay* drawn in *In re A-K-* and confirmed in *Kane* are equally valid and determinative in Dieng's case. The virtually unavoidable threat of FGM in Ethiopia is not comparable to conditions in Senegal, and from Mame's particular standpoint, as a Wolof with parents who oppose FGM, she would not be in jeopardy if she chose to return to Senegal with petitioners. See *Hounmenou v. Holder*, - - - F.3d- - - -, 2012 WL 3930991, at *4 (8th Cir. Sept. 11, 2012) ("Assuming without deciding that [the petitioner] was entitled to raise a claim of direct persecution based on the threat of FGM to his daughter Marine, such a claim would necessarily fail because the IJ expressly found that Marine herself did not have a well-founded fear of being subjected to FGM.").

In any event, as a U.S. citizen, Mame is legally entitled to remain in the United States, thereby completely avoiding any risk of FGM in Senegal and effectively quelling

Dieng's fear that Mame will be persecuted.  As in *In re A-K-*, Mame can remain in the United States either by staying with Lo's relative, or through the appointment of a guardian until she reaches the age of majority.  "Although this admittedly presents [petitioners] with a difficult and painful decision, we see no reversible error in the BIA's determination." *Kane*, 581 F.3d at 240; *see also Niang*, 492 F.3d at 513 n.11 (noting that such a choice "may work a hardship on U.S. citizen children, who may be forced to accompany their parents to the country of removal, . . . [but] this hardship is countenanced by the INA and not violative of the children's constitutional rights").

To the extent Dieng rests her application for relief on the fear that her oldest daughter Mariame, who resides in Gambia and is not a U.S. citizen, will be subjected to FGM, it is based on conjecture and therefore infirm.  *Cf. Bah*, 462 F.3d at 643 (holding that the petitioner could not establish a derivative asylum claim where her daughters continued to live abroad in a country where they faced the threat of FGM and never sought asylum in the United States based on their fear of persecution).

As this case demonstrates, the governing principle that we announced in *Abay* must be tempered by an overriding obligation under the INA to examine the unique facts of each case.  "[A]n asylum determination entails an individualized assessment," *Ashafi v. Holder*, 418 F. App'x 447, 450 (6th Cir. 2011), and "the determination of whether or not a particular applicant's fear is rebutted by general country conditions information requires an individualized analysis that focuses on the specific harm suffered and [its] relationship to . . . the particular information contained in the relevant country reports." *Chand v. INS*, 222 F.3d 1066, 1079 (9th Cir. 2000).  In particular, "FGM practices vary by ethnic group, religion and geographic region, as well as by the age and marital status of the woman or girl." *Abay*, 368 F.3d at 644 (Sutton, J., concurring).

Here, upon this record, the BIA's conclusion that Dieng did not prove her direct persecution claim on the basis of her fears for her daughters is supported by reasonable and substantial evidence.

IV.

For the foregoing reasons, we deny the petition for review.