RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0023p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

AMINATA DIENG; OUSSEYNOU NDIAYE LO,

                                       *Petitioners*,

    *v.*

WILLIAM P. BARR, Attorney General,

                                       *Respondent*.

No. 19-3010

───────────────

Appeal from the Board of Immigration Appeals;
Nos. A 088 197 111; A 093 428 046.

Decided and Filed:  January 22, 2020

Before:  BATCHELDER, WHITE, and THAPAR, Circuit Judges.

───────────────

**COUNSEL**

**ON BRIEF:**  Danielle Beach-Oswald, BEACH-OSWALD IMMIGRATION LAW ASSOCIATES, PC, Washington, D.C., for Petitioners.  Jennifer A. Singer, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

    BATCHELDER, J., delivered the opinion of the court in which THAPAR, J., joined. WHITE, J. (pp. 11–16), delivered a separate dissenting opinion.

───────────────

**OPINION**

───────────────

    ALICE M. BATCHELDER, Circuit Judge.  Aminata Dieng and her husband, Ousseynou Ndiaye Lo, petition for review of the order of the Board of Immigration Appeals (Board or BIA) denying their motion to reopen their application for asylum.  We hold that the Board did not

abuse its discretion when it found that petitioners failed to provide material evidence of changed country conditions in Senegal and therefore **DENY** the petition.

## I.

Aminata Dieng and Ousseynou Ndiaye Lo are citizens and natives of Senegal. Lo entered the United States in 1997 and although he entered the country on a non-immigrant student visa to enroll at the University of Tennessee, he never attended the university. Dieng used a false passport to join Lo in the United States in 2003. They married in 2005 and Dieng gave birth to a daughter a year later.

## A.

In 2007, Dieng applied for asylum, withholding of removal, and protection under the Convention Against Torture (CAT), claiming her husband as a derivative applicant.[1] Dieng alleged she was a member of the Fulani tribe and that she escaped Senegal because certain relatives attempted to subject her to female genital mutilation (FGM). She asserted that if she were removed to Senegal, she and her daughters[2] would be subjected to FGM by her relatives.

An Immigration Judge (IJ) held a removal hearing in 2008. Dieng and Lo both testified that Lo is a member of the Wolof tribe, an ethnic group that does not regularly practice FGM. Dieng stated that Senegalese nationals would therefore consider their daughter a member of the Wolof tribe, governed by Wolof traditions. Dieng conceded that if she returned to Senegal, it would be "too late for [her relatives] to have [her] circumcised" because she was married and had two children. AR 501. But Dieng and Lo feared that their daughter might be circumcised if she accompanied her parents to Senegal. Lo testified that if he and his wife returned to Senegal, his brother, an American citizen, could take care of their daughter. The IJ denied petitioners' request for asylum, withholding of removal, and protection under the CAT.

---

[1]We fully described the details of petitioners' asylum proceedings in *Dieng v. Holder*, 698 F.3d 866 (6th Cir. 2012). We revisit only the facts necessary to give context to the present petition.

[2]Dieng's oldest daughter, Mariame, was born in Gambia in 2003, as a result of a previous relationship in Senegal. Mariame has remained in Gambia with Dieng's mother since her birth.

The BIA denied Dieng and Lo's subsequent appeal. The BIA found that Dieng established past persecution. AR 384; *see* 8 C.F.R. § 208.13(b)(1) (providing that an applicant will establish refugee status if she establishes persecution "on account of . . . membership in a particular social group"). But because Dieng testified that she no longer feared FGM, the BIA found that a "fundamental change in circumstances" rebutted the presumption of a "well-founded fear of future persecution." AR 384; *see* 8 C.F.R. § 208.13(b)(1)(i)(A).

The BIA also held that it was reasonable for Dieng and Lo to internally relocate to another area of Senegal to avoid FGM. AR 384; *see* 8 C.F.R. § 208.13(b)(1)(i)(B) (providing that an IJ may deny the asylum application if the applicant "could avoid future persecution by relocating to another part of the applicant's country of nationality"). To support this conclusion, the BIA cited:

> (1) Lo's testimony that he was a member of the Wolof tribe, which does not practice FGM; (2) the dearth of evidence showing that Dieng's Fulani relatives (if still alive) would learn of her whereabouts in Senegal and seek her out to attempt FGM; and (3) the State Department's reports indicating that while the outlawed practice of FGM is common in Senegal, it is not universal.

*Dieng v. Holder*, 698 F.3d 866, 871 (6th Cir. 2012).

Finally, the BIA held that Dieng failed to establish a well-founded fear of persecution based on her claim that her daughter would be subjected to FGM if they returned to Senegal. AR 385. The BIA "reiterated the reasonable option of relocation to a safe area" within Senegal and noted that their daughter, as a member of the Wolof tribe, would not be subject to FGM. *Dieng*, 698 F.3d at 871. In an order dated March 25, 2010, the BIA dismissed petitioners' appeal but granted Dieng and Lo sixty days' voluntary departure. AR 383–87. We denied Dieng and Lo's petition for review. *See id*. at 866.[3]

---

[3]In Dieng and Lo's first petition, we considered the 2001 U.S. Department of State's report on FGM, which:

> estimated that approximately twenty percent of the female population in Senegal has undergone FGM, with ninety percent of these females being between the ages of two and five. The Wolof and Serere ethnic groups, and most Christians, do not engage in FGM, and it is hardly practiced at all in most heavily populated urban areas. The practice of FGM is primarily concentrated in rural areas amongst the Halpularen (Peul and Toucouleur) ethnic group.

*Dieng*, 698 F.3d at 873.

**B.**

Dieng and Lo nevertheless remained in the United States and their second daughter was born here in 2013. In early 2018, the Department of Homeland Security (DHS) began the process of enforcing the BIA's 2010 order and directed Dieng and Lo to renew their Senegalese passports. Only then did the petitioners file a motion to reopen their asylum application, alleging that changed conditions in Senegal warranted reopening. *See* 8 C.F.R. § 1003.2(c)(3)(ii).

Dieng and Lo proffered several documents in support of their motion. Personal affidavits and letters from several family members purported to show that certain relatives in Senegal learned of petitioners' impending removal from the United States and renewed their demands that Dieng and her daughters undergo FGM.[4] In his affidavit, Lo alleged: that he received letters from both of his parents asking about his return so that FGM could be performed on Dieng and their daughters; that his mother was a member of the Fulani tribe and had always demanded that Dieng and her daughters be circumcised; and that Lo's two sisters were circumcised and were making efforts to flee Senegal. The affidavits further alleged that the Senegalese government would not protect Dieng or her daughters from harm. To establish the prevalence of FGM in Senegal, Petitioners included a charitable organization's 2015 report entitled "Country Profile: FGM in Senegal," as well as the 2016 U.S. Department of State report on Senegal.[5]

The BIA held that the petitioners' motion was time-barred under 8 U.S.C. § 1229a(c)(7) and 8 C.F.R. § 1003.2(c)(2), which require aliens to file a motion to reopen within 90 days of the BIA's final order. AR 3. Although an exception exists for those seeking to apply for asylum based on changed country conditions, *see* 8 C.F.R. § 1003.2(c)(3)(ii), the BIA held that Dieng and Lo failed to "submit [] persuasive new evidence of changed country conditions arising in [Senegal] that would affect their asylum claim." AR 4. The BIA explained:

---

[4]Dieng also alleged that the stress from the fear of FGM caused her to miscarry and included a physician's letter indicating that she miscarried in August 2017. The record also includes a psychological evaluation stating that Dieng suffers from PTSD.

[5]The 2016 U.S. Department of State's report provided that "17 percent of girls below age 15 had been subjected to FGM [], but the practice continued to decline." AR 361–62.

> First, we give the statements in the [petitioners'] affidavits minimal weight as they are self-serving and speculative. Second, the statements in their affidavits regarding current country conditions in Senegal are not based on personal knowledge. Third, the multiple statements from the [petitioners'] family members are not persuasive because they are from interested witnesses, speculative, and not corroborated with objective evidence. More importantly, the new evidence presented does not overcome the central basis for our prior denial of their claim - that the [petitioners'] can internally relocate. Moreover, the [petitioners'] assertions that the Senegalese government is powerless to stop the [petitioners'] relatives who allegedly want to FGM [sic] done are not substantiated. Thus, the evidence presented does not demonstrate a change in country conditions or circumstances material to the [petitioners'] claim for relief or meet the [petitioners'] "heavy burden" of showing that if proceedings were reopened, the new evidence offered would likely change the result in the case.

AR 4 (internal citations omitted).

The BIA held that petitioners' fears that their daughters would be subjected to FGM could not provide a basis for reopening the proceedings and noted that petitioners' daughters are United States citizens and not required to accompany their parents to Senegal. AR 4. The BIA accordingly denied the motion to reopen and the petitioners appealed.

## II.

"We review the BIA's denial of a motion to reopen for an abuse of discretion." *Zhang v. Mukaskey*, 543 F.3d 851, 854 (6th Cir. 2008); *see* 8 C.F.R. § 1003.2(a) ("The decision to grant or deny a motion to reopen or reconsider is within the discretion of the Board . . . ."). All legal issues are reviewed de novo. *Precetaj v. Sessions*, 907 F.3d 453, 457 (6th Cir. 2018). We find an abuse of discretion when the BIA's decision "was made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination against a particular race or group." *Alizoti v. Gonzales*, 477 F.3d 448, 453 (6th Cir. 2007).

Generally, a petitioner must file a motion to reopen within 90 days of the final order of removal. *See* 8 U.S.C. § 1229a(c)(7); 8 C.F.R. § 1003.2(c). But a motion to reopen based on changed country conditions is excepted from the 90-day limitation if "it appears to the Board that evidence sought to be offered is material and was not available and could not have been

discovered or presented at the former hearing." 8 C.F.R. § 1003.2(c)(1), (3)(ii). Reopening motions must "state the new facts that will be proven at a hearing to be held if the motion is granted" and "supported by affidavits or other evidentiary material." 8 U.S.C. § 1229a(c)(7)(B).

## A.

Petitioners argue that the Board abused its discretion by failing to give a rational explanation for its decision to deny reopening. In petitioners' view, the Board did not adequately explain why the new evidence failed to establish changed country conditions. Specifically, petitioners argue that the Board erroneously ignored new evidence that: (1) Dieng and Lo's relatives renewed their threats to perform FGM, (2) Lo's sisters recently fled Senegal to protect their future daughters from FGM, and (3) FGM is practiced in Senegal despite the government's prohibition of the practice.[6]

Contrary to petitioners' assertion, the Board adequately explained the basis for its denial of the motion to reopen. There are

> at least three independent grounds on which the BIA might deny a motion to reopen—failure to establish a prima facie case for the relief sought, failure to introduce previously unavailable, material evidence, and a determination that even if these requirements were satisfied, the movant would not be entitled to the discretionary grant of relief which he sought.

*INS v. Doherty*, 502 U.S. 314, 323 (1992) (internal quotation marks omitted). Here, the BIA denied the motion on petitioners' "failure to introduce previously unavailable, material evidence." *See id.*

As a threshold matter, we note that the Board has "broad discretion" to weigh the credibility of the proffered evidence on a motion to reopen. *Yu Yun Zhang v. Holder*, 702 F.3d 878, 882 (6th Cir. 2012); *see INS v. Abudu*, 485 U.S. 94, 106–07 (1988) ("[T]he BIA may determine, either as a sufficient ground for denying relief or as a necessary step toward granting relief, whether the alien has produced previously unavailable, material evidence . . . ."). Although the Board cannot base its decision on "cursory, summary, or conclusory statements,"

---

[6]In their petition to this court, petitioners do not argue that they are entitled to reopening based on Dieng's fear that her daughters would be circumcised if they accompanied their parents to Senegal.

*Lindor v. Holder*, 317 F. App'x 492, 498 (6th Cir. 2009) (internal editing marks omitted), "[w]e do not require the Board's opinion to mention every piece of evidence before it or every logical element of a motion." *Zhang*, 543 F.3d at 854. Instead, we ask whether the BIA's decision articulated a basis to allow for meaningful appellate review. *Precetaj*, 907 F.3d at 459.

In this case, the Board allowed for meaningful review by explaining that petitioners failed to establish changed country conditions. "In determining whether evidence accompanying a motion to reopen demonstrates a material change in country conditions that would justify reopening, the BIA compares the evidence of country conditions submitted with the motion to those that existed at the time of the merits hearing below." *Bi Feng Liu v. Holder*, 560 F.3d 485, 491 (6th Cir. 2009) (internal editing marks omitted). For example, we have found evidence of a material change in country conditions when the petitioner showed that persecution of her social group had "escalated" since the original immigration proceeding. *See Lorenzo v. Barr*, No. 18-3606, 2019 WL 4065442, at *6 (6th Cir. July 9, 2019) (quoting *Yu Yun Zhang*, 702 F.3d at 880).

Dieng and Lo failed to establish such a material change. The Board explained as much when it found that petitioners' statements "regarding current country conditions in Senegal [were] not based on personal knowledge"; that the letters were unpersuasive because they were "from interested witnesses, speculative, and not corroborated with objective evidence"; and that the "assertions that the Senegalese government is powerless to stop the [petitioners'] relatives who allegedly want to FGM [sic] done [were] not substantiated." AR 3; *see Abdelghani v. Holder*, 567 F. App'x 388, 396 (6th Cir. 2014) (finding no abuse of discretion when the BIA "chose not to accord great weight to the affidavits of [petitioner's] relatives because they were from interested witnesses") (internal quotation marks omitted); *Harchenko v. INS*, 379 F.3d 405, 410 (6th Cir. 2004) ("[A]n alien filing a motion to reopen based on changed country conditions cannot rely on speculative conclusions or mere assertions of fear of possible persecution, but

instead must offer reasonably specific information showing a real threat of individual persecution.") (internal quotation marks omitted).**7**

Finding no material evidence of changed country conditions, the Board declined to reopen proceedings on Dieng and Lo's underlying asylum claim. The Board explained that it denied petitioners' original asylum application for failure to establish a "well-founded fear of persecution," AR 384–85; *see* 8 C.F.R. § 208.13(b)(1)(i)(B), and that "the new evidence presented [could] not overcome the central basis for [the BIA's] prior denial of their claim" (i.e., that Dieng and Lo could internally relocate). AR 3. Therefore, even if the new evidence were credible, petitioners still failed to establish a "well-founded fear of persecution." *See Yu Yun Zhang*, 702 F.3d at 880 ("Once a petitioner establishes changed country conditions, she must then establish a prima facie claim, or a reasonable likelihood of succeeding on the merits, for obtaining asylum . . . .") (internal quotation marks and italics omitted); *Yousif v. INS*, 794 F.2d 236, 241 (6th Cir. 1986) ("[A] motion to reopen should not be granted unless the petitioner makes a prima facie showing that the statutory requirements for the underlying relief have been met."). We found no abuse of discretion when we first considered the BIA's determination that petitioners could reasonably relocate to avoid FGM, *see Dieng*, 698 F.3d at 871, and we decline to do so in the present case.

**B.**

Petitioners point out that this court has compared the BIA's role in adjudicating motions to reopen immigration proceedings to "a trial court's role in reviewing a motion for summary judgment." *Trujillo Diaz v. Sessions*, 880 F.3d 244, 252 (6th Cir. 2018). Petitioners therefore contend that the BIA must "accept as true reasonably specific facts proffered by an alien in support of her motion unless [the BIA] finds those facts to be inherently unbelievable." *Id.* (quoting *Haftlang v. INS*, 790 F.2d 140, 143 (D.C. Cir. 1986)). According to petitioners, the

---

**7**The government gives numerous examples of inconsistencies between petitioners' 2008 testimony and the evidence offered for reopening. But in determining whether the BIA abused its discretion, we look only at "the basis articulated in the decision and we may not assume that the Board considered factors that it failed to mention in its opinion." *Precetaj*, 907 F.3d at 458–59 (quoting *Daneshvar v. Ashcroft*, 355 F.3d 615, 626 (6th Cir. 2004)) (internal editing marks omitted).

BIA abused its discretion because it did not "explicitly find" that petitioners' new evidence was "inherently unbelievable." *Lorenzo*, No. 18-3606, 2019 WL 4065442, at *5.

It is true that a prior panel has analogized the standard of review on a motion to reopen to the standard of review on a motion for summary judgment. *Trujillo Diaz*, 880 F.3d at 252; *see also Lorenzo*, No. 18-3606, 2019 WL 4065442, at *5. And we are bound by such precedent. *See* 6 Cir. R. 32.1(b). We note, however, that the Supreme Court has consistently analogized motions to reopen or reconsider immigration proceedings, not to motions for summary judgment, but to motions for relief from judgment under Federal Rule of Civil Procedure 60(b), *see Kucana v. Holder*, 558 U.S. 233, 242 (2010) (citing *Stone v. INS*, 514 U.S. 386, 401 (1995)); *Doherty*, 502 U.S. at 326, or to motions for a new trial under Federal Rule of Criminal Procedure 33. *See Abudu,* 485 U.S. at 110. Indeed, in *Abudu,* 485 U.S. at 109–10, the Supreme Court explicitly rejected the contention that motions to reopen immigration proceedings are analogous to motions for summary judgment:

> [The Court has] never suggested that all ambiguities in the factual averments must be resolved in the movant's favor, and we have never analogized such a motion to a motion for summary judgment. The appropriate analogy is a motion for a new trial in a criminal case on the basis of newly discovered evidence, as to which courts have uniformly held that the moving party bears a heavy burden.

*Id.* at 109–10 (citing *Taylor v. Illinois*, 484 U.S. 400, 414 n.18 (1988)). Comparing the BIA's adjudicatory role to that of a trial judge reviewing a motion for summary judgment is inappropriate where "every delay works to the advantage of the deportable alien who wishes merely to remain in the United States." *Doherty*, 502 U.S. at 323.

But even if the summary judgment standard analogy were correct, the BIA did, in fact, find that petitioners' new evidence was inherently unbelievable. When denying a motion to reopen, we require that the BIA articulate a basis for its decision that will allow this court to engage in meaningful review. *See Precetaj*, 907 F.3d at 458. Of course, such meaningful review is possible when the BIA explicitly declares that new evidence is inherently unbelievable. But we do not require the BIA to recite these magic words every time it denies a motion to reopen on evidentiary grounds. So long as the BIA adequately indicates its finding that new evidence was inherently unbelievable, we will find no abuse of discretion. *See Trujillo Diaz*, 880 F.3d at 253

(holding that the BIA abused its discretion because it did not "make any findings" indicating that the new evidence was "inherently unbelievable").

Here, the BIA explained that it gave the new evidence minimal weight because: the affidavits were "self-serving and speculative"; the petitioners' statements concerning changed country conditions were not "based on personal knowledge"; and the letters from petitioners' family members were from "interested witnesses, speculative, and not corroborated with objective evidence." AR 4. In other words, the BIA found that the petitioners' new evidence was inherently unbelievable. In any event, petitioners failed to substantiate their claim that the "Senegalese government is powerless to stop the [petitioners'] relatives" from performing FGM on Dieng and her daughters. *Id.* Such an unsubstantiated claim cannot rise to the level of a "reasonably specific fact" that the BIA is required to accept as true. *See Trujillo Diaz*, 880 F.3d at 252. We therefore find no abuse of discretion because the BIA gave a "rational explanation" for its determination that petitioners' new evidence lacked credibility. *See Alizoti*, 477 F.3d 448 at 453.

**III**.

For the foregoing reasons, we **DENY** the petition for review.

---

**DISSENT**

---

HELENE N. WHITE, Circuit Judge, dissenting. I do not agree that the BIA acted within its discretion in reviewing Petitioners' motion to reopen. The BIA failed to apply existing precedent and dismissed reasonably specific evidence presented in support of Petitioners' claims without providing adequate rationale.

## I. Background

The majority omits the following details of Petitioners' story, which go back to Dieng's childhood and are, in my view, critical to understanding the posture of this case.

At the hearing before the immigration judge in 2007, where both Dieng and Lo were found to be credible witnesses, Dieng described her family's history with the practice of FGM. Dieng testified that in 1981, her older sister had been subjected to FGM and died of a resulting infection. After that, her parents decided they opposed FGM and would not let Dieng be subjected to it. However, two of her uncles and her aunt felt strongly that Dieng should be circumcised. When Dieng was three, they came to her house and attempted to perform the procedure. When her mother tried to run from the house with Dieng, Dieng's uncle burned Dieng on the arm with a hot iron. Dieng's uncles continued to threaten her parents and, in May of 2001—when Dieng was about nineteen—her uncles and aunt returned to her family home and threatened to kill Dieng if they weren't allowed to circumcise her. A fight ensued, and her uncle hit her with a stick, threatened her with a knife, and cut the bottom of her foot before her neighbors intervened. That incident precipitated her decision to flee Senegal, first for Gambia, then for the United States.

This information formed the basis for the BIA's finding that Dieng had established past persecution based on her membership in a particular social group. However, because Dieng had testified that she believed it was too late for her relatives to subject her to FGM and that she was mainly concerned about her U.S. citizen daughters being subjected to FGM, the BIA found that Dieng had not established a well-founded fear of future persecution. The BIA also found that

Dieng and Lo could relocate to a part of Senegal where FGM is practiced less frequently, allowing Dieng and her daughters to avoid the threat of FGM. The BIA found it significant that the Wolof tribe, which Lo belongs to, does not generally practice FGM. The BIA added that with respect to Dieng's family, Petitioners "could not provide any concrete evidence of how these individuals would learn of their whereabouts, nor did they know if these individuals were even still alive." (R. 6-2, PID 88.)

As the majority states, Petitioners did not seek to reopen their asylum application until the Department of Homeland Security began the process of enforcing the BIA's 2010 order. But, Dieng explained that upon learning that Petitioners and their daughters faced imminent return to Senegal, relatives—including those whom the BIA had previously doubted could learn of Petitioners' whereabouts—called Dieng and renewed their threats to perform FGM on her and her daughters. The letters from family members offered in support of Dieng's affidavit support her account. Lo offered an affidavit and letters from family members explaining that his family was also seeking information about Petitioners' return to Senegal and that seeking safety with them would not be an option given his mother's belief in FGM. These letters also expressed that the Senegalese government would not protect Dieng and her daughters from Petitioners' relatives.

Petitioners supported their claims with a 2016 Department of State report stating that although FGM was criminalized in Senegal, the government had not prosecuted anyone for performing FGM during the previous year. The report stated that although the practice had declined overall and the percentage of Senegalese girls subjected to FGM was 17%, the Toucouleur (Fulani) ethnic group still practiced some of the most extreme forms of FGM. (*Id.* at PID 362.) A 2015 report produced by a charitable organization gave a slightly higher estimation of FGM prevalence at 25.7%, and noted that issues with self-reporting following the criminalization of FGM have contributed to difficulty measuring prevalence rates. (*Id.* at PID 300.)

## II.    Changed Country Conditions

With respect to the BIA's finding that Petitioners failed to produce previously unavailable, material evidence of changed country conditions, the majority correctly recognizes the BIA's broad discretion.  *See INS v. Abudu*, 485 U.S. 94, 96 (1988).  But this discretion is not limitless; the BIA abuses its discretion when it exercises it "in a way that is arbitrary, irrational or contrary to law."  *Daneshvar v. Ashcroft*, 355 F.3d 615, 625-26 (6th Cir. 2004).  Regardless of the most apt analogy, our precedent unambiguously required the BIA to "accept as true reasonably specific facts proffered by [Petitioners] in support of [their] motion to reopen unless it [found] those facts to be inherently unbelievable."  *Trujillo Diaz v. Sessions*, 880 F.3d 244, 252 (6th Cir. 2018) (quoting *Haftlang v. INS*, 790 F.2d 140, 143 (D.C. Cir. 1986)).  *See also Pablo Lorenzo v. Barr*, 2019 WL 4065442, at \*5 (6th Cir. July 9, 2019) (quoting *Trujillo*, 880 F.3d at 253) (finding that the BIA abused its discretion where it failed to "either 'explicitly find' that [the petitioner's] reasonably specific facts were 'inherently unbelievable' or 'accept' [his] facts 'as true' . . . ."); *Juan-Pedro v. Sessions*, 740 F. App'x 467, 471 (6th Cir. 2018) (same).  Insofar as the majority declines to apply this precedent, I disagree.

The majority relies on *I.N.S. v. Abudu* to support its assertion that "[c]omparing the BIA's adjudicatory role to that of a trial judge reviewing a motion for summary judgment is inappropriate."  (Maj. Op. at 9.)  But the Court in *Abudu* held only that courts of appeals reviewing the BIA's denials of motions to reopen for failure to introduce previously unavailable, material evidence must apply an abuse of discretion standard.  485 U.S. at 104-05.  Nothing in that holding requires us to give limitless discretion to the BIA.  Thus, we—and our sister circuits—have required the BIA to carefully consider reasonably specific evidence presented in support of a motion to reopen and either accept it as true or find it inherently unbelievable.  *See, e.g., Trujillo*, 880 F.3d at 253; *Bhasin v. Gonzales*, 423 F.3d 977, 987 (9th Cir. 2005) ("[F]acts presented in affidavits supporting a motion to reopen must be accepted as true unless inherently unbelievable."); *Gebremichael v. I.N.S.*, 10 F.3d 28, 40 (1st Cir. 1993) (noting that the BIA should accept as true facts stated in an affidavit supporting a motion to reopen); *Fessehaye v. Gonzales*, 414 F.3d 746, 755 (7th Cir. 2005) (same); *Shardar v. Attorney General of U.S.*, 503 F.3d 308, 317 (3d Cir. 2007) (evidence presented in affidavit in support of motion to reopen

"must be accepted as true at the motion-to-reopen stage"). Conclusory statements regarding an affidavit's speculative or incredible nature that are unsupported by the record are insufficient in this respect. *See* 880 F.3d at 253.

In *Trujillo*, the petitioner submitted a declaration from her father supporting her claim that her familial membership made her a target for violence. *Id.* at 252. The declaration included recitations of gang members' statements that they wanted to find the petitioner and her family because of her brother's refusal to join the gang. *Id.* The BIA found that the petitioner had failed to show that she would be targeted based on her familial membership because the declaration she offered was "speculative and conclusory." *Id.* Because the declaration contained specific facts linking the petitioner's familial membership to the threats against her, we concluded that the only way the BIA could have considered the declaration speculative or conclusory was if it had considered the facts within it to be "inherently unbelievable." *Id.* at 253. However, the BIA did not explicitly make such a finding. *Id.* "Nor did it make any findings that would indicate that it reached this conclusion," such as "internal inconsistencies" in the declaration or a "determination that [the] affidavit was incompatible with some other incontrovertible piece of evidence." *Id.* Because it did not make such a finding, we concluded that the BIA should have accepted the facts in the declaration as true. *Id.*

The BIA made a similar error here. It dismissed Petitioners' affidavits as "speculative," "not based on personal knowledge," and "self-serving," and found that "the multiple statements from the [Petitioners'] family members are not persuasive because they are from interested witnesses, speculative, and not corroborated with objective evidence." (R. 6-2, PID 4.) Yet the affidavits include reasonably specific facts describing changed circumstances in Senegal. For example, Dieng stated in her affidavit that once she and her husband renewed their passports to return to Senegal around February of 2018, her uncles began calling her demanding to know the date of their arrival and demanding that she and her daughters be subjected to FGM. She described her family's anger with her for not "being cut" and not allowing her daughters to be cut. (*Id.* at PID 65.) These claims are consistent with statements in letters from the family, including a letter from Dieng's cousin—who herself states she was subjected to FGM as an adult—explaining that Dieng's uncles and aunts have "harassed" her to find out about Dieng and

her family and plan to "put their hands on all of you to perform the FGM and show respect to our Fulani culture." (*Id.* at PID 153.) Other letters contain similar statements. (*See, e.g.*, Letter from Ndeye Lo, *id.* at PID 146-47 ("My Mother is well aware of your wife Aminata and your daughter's situation, knowing that your entire family will be sent home soon due to your status and your wife status. . . .Trust me, they will have FGM done on them as soon as they get to Senegal.").)

As in *Trujillo*, the BIA could only have found this evidence to be speculative, uncorroborated, and not based on personal knowledge if it found the declarations, letters, and reports provided by Petitioners to be inherently unbelievable. As described above, the affidavits contain reasonably specific facts based largely on personal communications from family members in Senegal. The accompanying letters, especially the letter from Dieng's cousin describing her own experience as an adult subjected to FGM, corroborate Petitioners' statements about the new threats against Dieng and her daughters. And although the DHS and charitable organization reports suggest that overall rates of FGM in Senegal have decreased, they also indicate that the practice remains prevalent among many ethnic groups, including the group to which Dieng belongs.

But the BIA did not find the evidence presented by Petitioners to be inherently unbelievable. Nor did it make other findings that would suggest as much—i.e., findings of internal inconsistencies or inconsistencies with other, incontrovertible evidence.[1] *See* 880 F.3d at 253. Without finding the declarations and letters to be inherently unbelievable, the BIA should have accepted the reasonably specific facts within them to be true. *Id.* Its failure to do so was an abuse of discretion.

---

[1]The majority maintains that even if the BIA was required to either accept the reasonably specific facts asserted by Petitioners as true or find them inherently unbelievable, the BIA met its obligation because it *did* find the evidence inherently unbelievable. I disagree that the BIA made such a finding. Although the BIA need not always use the phrase "inherently unbelievable" to discredit evidence presented in a motion to reopen, where, as here, petitioners present specific, consistent evidence of threats of violence against them, the BIA must offer more than conclusory statements as to the "speculative" or "uncorroborated" nature of the evidence to demonstrate that it considered the evidence inherently unbelievable. *See Trujillo*, 880 F.3d at 253.

### III.     Prima Facie Eligibility

The BIA found that Petitioners failed to establish a well-founded fear of future persecution because "the new evidence presented does not overcome the central basis for [its] prior denial of their claim—that the respondents can internally relocate." (R. 6-2, PID 4.)  The BIA also concluded that "the respondents' assertions that the Senegalese government is powerless to stop the respondents' relatives who allegedly want to [sic] FGM done are unsubstantiated." (*Id.*)

It may be true that when Petitioners first presented their claims in 2008, they failed to show that they could not safely relocate in Senegal or that the government was unable or unwilling to protect Dieng and her children.  But that was 2008.  In 2019, Petitioners presented *new evidence* in support of their argument that they cannot safely relocate to another part of Senegal and that the Senegalese government will not protect them.  For example, Petitioners submitted statements expressing that their families began actively seeking information about their return to Senegal in 2018 and explaining that the family had found Dieng's adult cousin upon her own return to the country and had performed FGM on her against her will.  They also submitted reports showing that despite the criminalization of FGM, it is still practiced with impunity.  Rather than considering this evidence and explaining its insufficiency, the BIA elected to rest on its previous denial of Petitioners' claim.

That too is reversible error.  Although the BIA can choose to base its denial of a motion to reopen on any independent ground, "once it elects the ground(s) on which to base its ruling, the BIA needs to analyze and explain the basis on which it decides against a petitioner." *Lindor v. Holder*, 317 F. App'x 492, 499 (6th Cir. 2009).  It cannot rely on "[c]ursory, summary, or conclusory statements." *Daneshvar*, 355 F.3d at 626.  That is precisely what the BIA did in this case.

### IV.     Conclusion

For the foregoing reasons, I would grant the petition for review, vacate the BIA's decision, and remand for further proceedings.