NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0510n.06

Case No. 22-3330

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Dec 08, 2022
DEBORAH S. HUNT, Clerk

ALEN HANNA ROFA,

    Petitioner,

v.

MERRICK B. GARLAND, Attorney General,

    Respondent.

)
)
)
)
)
)
)
)
)
)
)

ON PETITION FOR REVIEW FROM THE UNITED STATES BOARD OF IMMIGRATION APPEALS

OPINION

Before: LARSEN, DAVIS, and MATHIS, Circuit Judges.

**MATHIS, Circuit Judge.** Alen Hanna Rofa petitions this Court to review a final order of the Board of Immigration Appeals ("BIA") adopting and affirming the decision of an Immigration Judge ("IJ") denying him deferral of removal under the Convention Against Torture ("CAT"). For the reasons that follow, we **DENY** Rofa's petition for review.

**I.**

Rofa is a native and citizen of Iraq who was admitted to the United States as a lawful permanent resident in 1999. Rofa came to the United States at the age of ten, but because his parents could not take care of him and his brothers, they were removed from their parents' home in 2001 and lived in foster care. Rofa lived with about ten different foster families over the course of three years. At the age of fifteen, Rofa was convicted of second-degree murder in violation of Michigan Penal Code § 750.317 following his participation in a deadly robbery. He was sentenced

to between seventeen and thirty years in prison. After serving sixteen years of his sentence, on June 15, 2021, Rofa was served with a Notice to Appear ("NTA"). The NTA charged him as removable under 8 U.S.C. § 1127(a)(2)(A)(iii) as a noncitizen convicted of an aggravated felony as defined in 8 U.S.C. § 1101(a)(43)(A) (relating to murder) and 8 U.S.C. § 1101(a)(43)(F) (relating to a violent crime for which the term of imprisonment is one year or more).

Rofa requested deferral from removal under CAT, claiming that he feared he would be tortured and killed if he returned to Iraq. According to Rofa, he identifies as Roman Catholic, specifically as a Chaldean Christian, which would make him vulnerable to torture in Iraq. His faith is shown through his tattoos, which include "numerous carpenter tools covering throughout [his] body with Jesus' portrait on the back of [his] arm," as well as a Chaldean symbol to signify that he is a Chaldean Christian. (A.R. 289). Rofa does not speak Arabic, which he claims would raise suspicion and potentially subject him to torture. Additionally, he has no Iraqi identification documents and does not know anyone in Iraq who would vouch for him because all his family and friends are in the United States.

In support of his claims, Rofa submitted the declaration of his expert witness, Dr. Tareq A. Ramadan ("Dr. Ramadan"), as well as sixteen articles discussing country conditions in Iraq, the U.S. State Department's Iraq 2020 Human Rights Report, the Iraq 2020 Religious Freedom Report, and the Iraq 2021 Religious Freedom Report. In opposition, the Department of Homeland Security ("DHS") submitted a declaration of its expert witness, Dr. Michael Rubin ("Dr. Rubin"), as well as fifteen articles discussing country conditions in Iraq.

On July 13, 2021, Rofa appeared before the IJ and, through counsel, admitted the factual allegations in the NTA and conceded removability. An individual hearing was later held on September 17, 2021, during which the IJ heard testimony from Dr. Ramadan and Rofa's brother.

Dr. Rubin did not testify on DHS's behalf. Rofa's brother confirmed Rofa's account of their time in foster care and described Rofa as a Christian and expressed his fear that Rofa would be harmed if removed to Iraq. According to Rofa, he should not be returned to Iraq because he was at risk of torture on account of his Christianity, "inability to speak Arabic, a lack of valid Iraqi identification documents or any family in Iraq to otherwise support or vouch for him, a felonious criminal record, and Christian and English-language tattoos." (*Id.* at 157). Rofa claimed that his "path to torture" could conceivably begin at the Baghdad International Airport because he did not have valid Iraqi identification. (*Id.* at 159). Rofa further argued that once in Iraq, he would face checkpoints manned by the Popular Mobilization Force ("PMF"), where he would be subjected to increased questioning and potential detention.

The declarations of both Drs. Ramadan and Rubin were admitted into evidence, and Dr. Ramadan was deemed credible and qualified to testify on Rofa's behalf. Speaking to the general conditions in Iraq, Dr. Ramadan testified that the Islamic State ("ISIS") continued to engage in attacks, even though it was no longer in control. Dr. Ramadan also testified that the Iranian Revolutionary Guards Corps was active in Iraq, and the state-sanctioned, Iranian-allied PMF was trying to make Iraq a "fanatical" Islamist country. (*Id.* at 221–22, 224).

Iraq's Christian population had been declining since 2003, and even though Christians had been encouraged to return to Iraq, the PMF used checkpoints to harass, threaten, and assault Christians, sometimes preventing them from returning home. At times, the PMF stole from and boycotted Christian businesses. In his declaration, Dr. Ramadan described three individuals who returned to Iraq from western countries and who allegedly suffered assaults and torture. Only one of the three was allegedly tortured by the PMF, and Dr. Ramadan testified that it was difficult to say how often such torture of Iraqis returning from western countries occurred. Further, Dr.

Ramadan testified that the 2020 killings of Qassim Suleimani and PMF engineer Mahdi al-Muhandis renewed anti-American sentiment in Iraq, leading to increased attacks against U.S. convoys, troops, bases, and personnel. The rise in attacks also created fear in Iraqi Christians, who worried they would be perceived as sympathetic to the West.

Regarding Rofa specifically, Dr. Ramadan testified that it would be hard for Rofa to conceal his Christian identity considering his Christian name, tattoos, and inability to speak Arabic, Iraq's official language. Dr. Ramadan also opined that Rofa was vulnerable because he was not familiar with Iraq, had a criminal record, and lacked any form of Iraqi identification, which could lead to him being considered a security concern at a PMF checkpoint or, worse, detention, interrogation, and imprisonment. Dr. Ramadan cited two instances where individuals returning to Iraq faced difficulties because they lacked identification. Although he could not say with certainty how frequently such interactions led to imprisonment and torture, Dr. Ramadan testified that not everyone who goes through a PMF checkpoint is detained, put in prison, or harmed.

The IJ ultimately rejected Rofa's claim for relief under CAT, finding that he failed to establish that he would more likely than not be tortured if returned to Iraq. Although the IJ found Dr. Ramadan's testimony and declaration credible and consistent with the country reports, they were insufficient to show a particularized threat of torture. The IJ found that although evidence in the record identified incidents of torture carried out by the PMF and Iraqi Security Forces ("ISF"), the evidence also showed that such conduct was generally aimed toward Sunni Arabs (suspected ISIS affiliates), human rights activists, intellectuals, and political protesters. Because Rofa did not fall into any of these categories, the IJ determined that Rofa did not show that he would be at particular risk for torture even if he was detained, particularly since the PMF was targeting "official or private U.S. interest[s]." (*Id.* at 158, 160).

The IJ also determined that there was no evidence that Rofa would face harm when entering Iraq, nor was there any evidence that he would be subjected to physical harm or torture on account of his lack of documents. Additionally, the IJ did not agree that Rofa was at risk based on his criminal record because, under Iraqi criminal law, Rofa could not be prosecuted in Iraq since he had already been convicted and completed his sentence. The IJ also noted that while the PMF and ISF "commit abuses against Iraqi citizens with relative impunity . . . these harms do not amount to torture." (*Id.* at 158 (citations omitted)). And although there was "evidence of harm that does amount to torture in the record," such evidence did not show that Rofa would face a "particularized threat of torture" if returned to Iraq. (*Id.*). As such, the IJ denied Rofa's application for deferral of removal and ordered him removed to Iraq.

On December 23, 2021, Rofa appealed the IJ's decision. The BIA, sitting as a single-member panel, adopted and affirmed the IJ's decision on appeal. The BIA concluded that contrary to Rofa's arguments, the IJ did not fail to provide sufficient analysis or improperly weigh any of the record evidence. Additionally, the BIA found that the IJ did not clearly err in its finding regarding the likelihood of future torture. Lastly, the BIA determined that it was not bound by the unpublished BIA decisions Rofa cited.

**II.**

Where the BIA "expressly adopts and affirms the IJ's decision but adds comments of its own," we "directly review the decision of the IJ while also considering the additional comments made by the [BIA]." *Yeremin v. Holder*, 738 F.3d 708, 714 (6th Cir. 2013) (internal quotation marks and citation omitted). Factual challenges to the BIA's denial of an application for CAT protection are reviewed under the substantial-evidence standard, which is "highly deferential." *Nasrallah v. Barr*, 140 S. Ct. 1683, 1692 (2020). The BIA's findings stand "unless any reasonable

adjudicator would be compelled to conclude to the contrary." *Id.* (citation omitted); *Marqus v. Barr*, 968 F.3d 583, 588 (6th Cir. 2020). Questions of law are reviewed de novo. *Marqus*, 968 F.3d at 589.

**III.**

In his petition for review, Rofa asks us to consider whether the BIA, in adopting and affirming the IJ's decision: (1) erred in concluding that PMF and ISF abuses do not amount to torture; (2) erred in concluding that Rofa was not more likely than not to be tortured on return to Iraq; (3) erred by ignoring country reports regarding the conditions in Iraq and improperly weighing expert testimony; (4) misapplied the Attorney General's decision in *In re J-F-F-*, 23 I. & N. Dec. 912 (A.G. 2006); and (5) reached a decision inconsistent with similar cases. For the reasons explained below, we **DENY** Rofa's petition.

A.

The BIA and IJ did not err in concluding that PMF and ISF abuses do not *per se* amount to torture. This is a factual challenge reviewable under the substantial-evidence standard. *See Nasrallah*, 140 S. Ct. at 1692.

CAT bars removal to a country where an individual "is more likely than not to be tortured." 8 C.F.R. § 1208.17(a). An individual may seek a deferral of removal and will succeed if he establishes that "it is more likely than not that he [] would be tortured" upon removal. *Id.* § 1208.16(c)(2). "Torture is an extreme form of cruel and inhuman treatment" that is "specifically intended to inflict severe physical or mental pain or suffering." *Id.* §§ 1208.18(a)(2), (a)(5). To qualify for protection, such torture must be "inflicted by, or at the instigation of, or with the consent or acquiescence of, a public official acting in an official capacity or other person acting in an official capacity." *Id.* § 1208.18(a)(1). Additionally, to attain relief, an individual must show more

than just a "consistent pattern of gross, flagrant, or mass violations of human rights in a particular country." *In re S-V-*, 22 I. & N. Dec. 1306, 1313 (BIA 2000), *abrogated on other grounds by Amir v. Gonzales*, 467 F.3d 921, 927 (6th Cir. 2006). He must show that he faces a "particularized threat of torture." *Almuhtaseb v. Gonzales*, 453 F.3d 743, 751 (6th Cir. 2006). All evidence that is relevant to a possibility of future torture must be considered. *See* 8 C.F.R. § 1208.16(c)(3); *In re J-E-*, 23 I. & N. Dec. 291, 303 (BIA 2002); *Marqus*, 968 F.3d at 589.

Rofa argues that the IJ erred in determining that PMF and ISF abuses do not amount to torture because such a determination is inconsistent with the evidence in the record. The IJ found that "both the PMF and the ISF commit abuses against Iraqi citizens with relative impunity," citing specific examples such as "verbal harassment, threats and pressure against religious minorities to observe Islamic customs, extortion, arbitrary arrest, detention and physical assault." (A.R. 158). The IJ noted, however, that while such conduct is "reprehensible," it "do[es] not amount to torture." (*Id.*). The IJ also found that "there is evidence of harm that does amount to torture in the record," citing State Department and International Religious Freedom reports noting the PMF and ISF's engagement in "forced disappearances, extrajudicial and unlawful killings, and the torture of detainees and prisoners in the country." (*Id.*). However, he distinguished such actions because they were carried out against specific groups of which Rofa is not a member, namely Sunni Arabs, human rights activists, intellectuals, and political protesters. (*Id.*).

The IJ's finding that certain activities do not rise to the level of torture is not mutually exclusive with his statement that there is evidence of torture in the record. Not all harms are considered torture. *See* 8 C.F.R. § 1208.18(a)(2) (noting that torture "does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture."); *see also, e.g.*, *Suleiman v. Garland*, 849 F. App'x 587, 589 (6th Cir. 2021) (stating that "extortion and

property seizure do not qualify as torture"). It is conceivable that the evidence includes some activities that are torture and some activities that are not. As noted above, generalized references to torture are insufficient to warrant CAT protection. Rofa must prove a particularized threat of torture to him, and the IJ correctly determined that any threat of torture posed by the PMF and ISF was aimed at groups to which Rofa does not belong. Indeed, we have held similarly in other cases. *See, e.g.*, *Solaka v. Wilkinson*, 844 F. App'x 797, 799 (6th Cir. 2021) (concluding that a Chaldean Christian did not show a particularized risk of torture when the evidence showed that "only those connected to ISIS . . . are in danger."); *Almuhtaseb*, 453 F.3d at 751 (concluding that general statements regarding the detainment and torture of Palestinians, "even if taken at face value, do not show that it is 'more likely than not' that Almuhtaseb herself would be subject to such treatment"). Because we agree that not all of the PMF and ISF's activities constitute torture, we do not disturb the IJ's finding.

B.

The BIA, in adopting and affirming the IJ's decision, did not err in concluding that Rofa failed to show he was more likely than not to be tortured on return to Iraq. We also review this issue under the substantial-evidence standard. *See Abdulahad v. Barr*, 838 F. App'x 126, 136 (6th Cir. 2020). Rofa must show a particularized threat of torture. His primary argument for relief is that he is a Chaldean Christian. Rofa relies heavily on our decision in *Yousif v. Lynch*, in which we held that Yousif's status as a Chaldean Christian "alone entitle[d] him to withholding of removal, given that there [was] 'a clear probability' that he would be subject to future persecution if returned to contemporary Iraq." 796 F.3d 622, 628 (6th Cir. 2015). Since our decision in *Yousif*, however, we have repeatedly cautioned that this statement "did not 'establish an entitlement to withholding of removal for all time' for Iraqi Chaldean Christians." *Solaka*, 844 F. App'x at 799

(quoting *Ishac v. Barr*, 775 F. App'x 782, 788 (6th Cir. 2019)); *Abdulahad*, 838 F. App'x at 134; *Marqus*, 968 F.3d at 588. And *Yousif* was based on a showing of a clear probability of persecution, not torture. *Compare Thap v. Mukasey*, 544 F.3d 674, 681 (6th Cir. 2008) (defining persecution), *with Almuhtaseb*, 453 F.3d at 751 (defining torture). Thus, Rofa's status as a Chaldean Christian alone does not entitle him to relief as a matter of law. *See Ishac*, 775 F. App'x at 788.

The record evidence does not support Rofa's other arguments. The IJ considered Rofa's argument that he may be subjected to torture when arriving at the airport in Iraq or when going through PMF checkpoints once in Iraq because, aside from his Christian identity, he did not have valid Iraqi identification documents, could not speak Arabic, had been in the United States for some time, and had a criminal record, all of which would lead to additional questioning and potential detainment. The IJ reviewed the evidence and determined that because the PMF does not have a presence at the airport, there was no risk of harm during the entry process. Additionally, the IJ acknowledged that although Rofa did not have Iraqi identification documents and would "likely encounter increased questioning and possible detention while the security forces seek to verify his identity" at PMF checkpoints, there was no evidence that Rofa would face indefinite detention or harm amounting to torture. (A.R. 159). Rofa's expert, Dr. Ramadan, pointed only to possible "ill-treatment" of undocumented Iraqis, and the IJ concluded that none of the evidence "show[ed] physical harm, let alone torture of an individual by the PMF or ISF, simply due to a lack of documents." (*Id.*). Information in the record regarding general ill treatment of Iraqi citizens is insufficient to show a particularized threat of torture to Rofa. *See Saleh v. Barr*, 795 F. App'x 410, 419 (6th Cir. 2019) (A particularized threat of torture "must be more than general allegations of a threat against a group that the applicant belongs to.") We see no reason to disturb the IJ's findings.

Rofa claims that he would be tortured based on his Westernization, but the evidence suggests otherwise. The State Department reports, which "are generally the best gauge of conditions in foreign countries," *Dieng v. Holder*, 698 F.3d 866, 872 (6th Cir. 2012), did not "provide a single incident of the torture or killing of Americanized or Christian Iraqis, solely on account of those bases." (A.R. 159–60).

We, like the IJ, acknowledge that Rofa would "by no means have a comfortable life upon return to Iraq." (*See id.* at 161.). But facing difficulties does not mean that he is more likely than not to be subjected to torture.

C.

The next issue for review is whether the IJ's decision, as adopted and affirmed by the BIA, erred in its consideration of evidence, specifically by ignoring country reports and improperly weighing expert testimony. This is a question of fact reviewed under the substantial-evidence standard. *See Shafo v. Wilkinson*, 844 F. App'x 791, 796 (6th Cir. 2021); *Shakkuri v. Barr*, 780 F. App'x 286, 290–91 (6th Cir. 2019).

1.  Consideration of Country Reports

Rofa argues that the IJ did not discuss or analyze several documents in its determination that Rofa had not shown that he was more likely than not to be tortured on return to Iraq, including reports from the State Department and news articles provided by both Rofa and DHS. Specifically, the record included the Iraq 2020 Human Rights Report, the Iraq 2020 Religious Freedom Report, and the Iraq 2021 Religious Freedom Report. According to Rofa, there was "no discussion or analysis of the 2020 or 2021 Religious Freedom reports and little regarding the 2020 Iraq Human Rights Report." Indeed, the IJ is required to consider all evidence that is relevant to the possibility

of future torture under *In re J-E-*, and we have determined that State Department reports are "generally the best gauge of conditions in foreign countries." *Dieng*, 698 F.3d at 872.

The IJ considered the above-mentioned reports.[1] Although it did not refer to all the reports by name, the IJ cited the reports in addressing Rofa's arguments and took administrative notice of the Iraq 2020 Religious Freedom Report, a September 2, 2021, State Department Country Report, and a United Kingdom-issued country report. The BIA correctly determined that the IJ "carefully considered all of the evidence of record."

Rofa's argument that the IJ erred by not explaining "if or why he found the ignored documentary evidence to be 'inherently unbelievable' or 'incompatible with some other incontrovertible piece of evidence'" as required by our decision in *Shabo v. Barr*, 836 F. App'x 370 (6th Cir. 2020) also fails. *Shabo* involved the BIA's denial of a motion to reopen removal proceedings, and "[i]n adjudicating a motion to reopen, the BIA 'must accept as true reasonably specific facts proffered by an alien in support of a motion to reopen unless it finds those facts to be inherently unbelievable.'" *Id.* at 373 (quoting *Trujillo Diaz v. Sessions*, 880 F.3d 244, 252 (6th Cir. 2018)). The same standard that applies on a motion to reopen does not apply here—all that is required is that the IJ consider all evidence relevant to the possibility of future torture. That is what the IJ did here.

## 2. Weighing of Expert Testimony and Declarations

The BIA determined that the IJ did not err in its weighing of the testimony and declarations of expert witnesses, Drs. Ramadan and Rubin. The BIA's finding is "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B);

---

[1] Because the IJ considered the State Department reports, Rofa's claim that this case should be remanded pursuant to *Dieng* fails.

*Nasrallah*, 140 S. Ct. at 1692; *Shafo*, 844 F. App'x at 796. It is not within our province to reweigh evidence, and "[w]hen the evidence could reasonably point in either direction, we must defer to the agency's choice." *Shafo*, 844 F. App'x at 796 (citing *Al-Koorwi v. Barr*, 837 F. App'x 323, 327–28 (6th Cir. 2020)); *see also Marqus*, 968 F.3d at 589 (stating that where the applicant asks the Court to reweigh the evidence and "the Government has introduced its own credible body of evidence to the contrary, [the Court] defer[s] to the IJ's factual findings").

On appeal to the BIA and before us, Rofa claims that the IJ improperly weighed the opinion of his expert witness, Dr. Ramadan, by relying heavily on the "stale" declaration of DHS's expert, Dr. Rubin, which was provided more than seventeen months prior to Rofa's individual hearing. According to Rofa, "the IJ did not give Dr. Ramadan's expert declaration and credible expert testimony the weight it deserved under BIA precedent including *In re M-A-M-Z-*, 28 I. & N. Dec. 173 (BIA 2020)."

As the BIA pointed out, the record does not support Rofa's arguments. First, although Rofa did not object to DHS's evidence (Dr. Rubin's declaration), the IJ acknowledged that the declaration was seventeen months old and stated that he would consider this fact in weighing the evidence. Second, the IJ appropriately considered Dr. Ramadan's testimony and declaration, which he cited throughout the decision, under *In re M-A-M-Z-*. *See In re M-A-M-Z-*, 28 I. & N. Dec. at 177 ("Expert witness testimony is evidence and so is treated the same as all evidence in immigration proceedings, where the Immigration Judge is the trier of fact and weighs the evidence in accordance with that role."). The IJ ultimately determined that although Dr. Ramadan's testimony and written declaration were "reliable and largely consistent with the United States and United Kingdom reports in the record," they were insufficient to meet Rofa's burden because, even though there was evidence of torture in the record, Rofa could not show that he would be at

particular risk for torture. (A.R. 157–58). Indeed, "even where, as here, an Immigration Judge finds an expert to be a credible witness, it does not follow that the Immigration Judge must accept all the testimony and opinions provided as facts." *In re M-A-M-Z-*, 28 I. & N. Dec. at 177. DHS provided "its own credible body of evidence," which supported the IJ's findings that Rofa was not within the groups primarily targeted by the PMF (e.g., ISIS), and that the cited abuses suffered by Iraqi citizens generally did not constitute torture. *See, e.g.*, *Abdulahad*, 838 F. App'x at 136 (citing *Marqus*, 968 F.3d at 589) (denying petition for review where the government provided "its own credible body of evidence" to support the IJ's findings). Thus, substantial evidence supports the IJ's factual findings, as well as the BIA's conclusion that the IJ did not improperly weigh or consider the record evidence.

D.

The IJ's decision, as adopted and affirmed by the BIA, did not misapply *In re J-F-F-*. "Whether the BIA and the IJ applied the correct legal standard . . . is a question of law that we review de novo." *Marqus*, 968 F.3d at 589. Under *In re J-F-F-*, an applicant for relief under CAT must show that each step in a hypothetical chain of events is "more likely than not to happen." *In re J-F-F-*, 23 I. & N. Dec. at 917. "It is the likelihood of all necessary events coming together that must more likely than not lead to torture, and a chain of events cannot be more likely than its least likely link." *Id.* at 918 n.4.

Rofa argues that he has established the following chain of events, which would come together to result in likely torture:

> (1) Mr. Rofa's particular individual characteristics including his Christian name, his prominent tattoos, his lack of ability to speak or read Arabic, and his identification as an American deportee with a serious felony conviction for murder will more likely than not make him immediately suspicious upon arrival at an Iraqi port of entry or airport; (2) the heightened suspicion will more likely than not lead to further questioning by authorities regarding his

- 13 -

identity; (3) Rofa's lack of Iraqi identity documents or local family connections will make detention more likely; (4) as stated in the 2020 Iraq Country Report, the PMF and ISF have engaged in torture of detainees and prisoners in the country.

Rofa points to the IJ's statement that "there are no reports in the record to show physical harm, let alone torture of an individual by the PMF or ISF, simply due to a lack of documents" as evidence that it misapplied the test. DHS argues that even if the IJ cited *In re J-F-F-* for the proposition that each event in the hypothetical chain of events leading to torture must be more likely than not to occur, the IJ rendered its decision based on a separate finding that Rofa failed to show a particularized threat of torture. As such, DHS cites *Marqus* for the proposition that remand is unnecessary because the IJ's decision to deny relief did not turn on an analysis of a hypothetical chain of events but rather on a finding that the applicant could not show a particularized threat of torture.

Although the IJ indicated several times that Rofa's claim failed because he did not show a particularized threat of torture, the IJ also appears to have considered each of the events in Rofa's chain. After finding that Rofa failed to show that each event in the chain was more likely than not to happen, the IJ stated that Rofa did not carry his burden of showing he would more likely than not be tortured by or with the acquiescence of the Iraqi government. The IJ agreed that some of Rofa's individual characteristics may make him suspicious and subject him to questioning by authorities (events 1 and 2), but Rofa did not prove "that it is more likely than not that he will be detained indefinitely" due to not having identification documents (event 3) so as to make torture (event 4) more likely than not to occur. (A.R. at 159). The BIA determined that this was a permissive view of the evidence.

Rofa claims that Dr. Ramadan's testimony and declaration show that such detention was likely, but Dr. Ramadan only posits that individuals without Iraqi identification documents are

"vulnerable to arbitrary detention and ill-treatment" and that they may "be detained if they are stopped at a checkpoint," putting them "at risk of detention and torture." (*Id.* at 916). Although Dr. Ramadan provides examples of individuals who allegedly were "prevented from freely traveling within Iraq" based on their lack of identification documents, Dr. Ramadan does not indicate that any of these individuals were necessarily detained on account of their lack of identification alone. (*Id.* at 916–17). Without more, Rofa cannot show that he would more likely than not be detained due to his lack of identification documents and, without such a showing, he cannot prove that he would more likely than not be tortured if removed to Iraq. *See Shakkuri v. Barr*, 780 F. App'x 286, 293 (6th Cir. 2019) (holding that when the petitioner "alleged that he would be detained at the airport, would be transported to a detention facility, and then would be tortured for one of the many proffered reasons" in interdependent form, there was no error in finding that because one of the steps was not more likely than not to occur, torture was not more likely than not to occur).

E.

Rofa argues that the IJ's decision, as adopted and affirmed by the BIA, is inconsistent with similar cases. At the outset, we note that unpublished BIA orders are not precedential. *See* 8 C.F.R. § 1003.1(g)(2); *Ishac*, 775 F. App'x at 793 n.8. In some circumstances, "the BIA's failure to explain inconsistent outcomes may raise 'an inference of arbitrary decisionmaking.'" *Al-Koorwi*, 837 F. App'x at 332 (quoting *Nissan v. Barr*, 788 F. App'x 365, 367 (6th Cir. 2019) (per curiam)). "The BIA will sometimes reach opposite conclusions in cases that have many factual similarities, but this does not reflect a failure of the agency to follow its own precedent. Rather, the different outcomes are an expected result of the discretionary weighing required to make individualized determinations." *Id.* (quoting *Etienne v. Holder*, 659 F.3d 513, 518 (6th Cir. 2011)).

We are not persuaded that the BIA acted arbitrarily in denying Rofa relief under CAT, even though there are unpublished cases with facts similar but not identical to Rofa's that resulted in different outcomes. As the BIA noted, "every case must be considered on its own merits based on the specific evidence submitted in that particular case." (A.R. 5 (citing *In re O. Vazquez*, 25 I. & N. Dec. 817, 822 n.5 (BIA 2012))). Rofa claims the "BIA committed legal error by reaching inconsistent decisions on essentially identical cases without reasoned explanation." We disagree. The BIA considered the cases provided by Rofa and noted that "[a]lthough there are similarities between the evidence reflected in the decisions the respondent cites and his own proceedings, the decisions give only a glimpse of the evidence considered in those cases," making it impossible "to determine the extent to which the cases are legally and factually similar." (A.R. 5). Such an explanation is sufficient to show that the BIA did not ignore its own precedent. Importantly, we have denied petitions for review in cases with similar facts. *See, e.g.*, *Solaka*, 844 F. App'x at 799 (finding that petitioner could not show "that a reasonable adjudicator would be compelled to decide that [he] faces a high likelihood of torture based on his status as a Chaldean Christian, his ties to the United States, his criminal record, [and] his lack of identity documents."); *Marqus*, 968 F.3d at 588-89 (same).

## IV.

For the foregoing reasons, we **DENY** Rofa's petition for review.