NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0185n.06

Nos. 21-3826 / 22-3731

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

BASAM PETROS,

  Petitioner,

v.

MERRICK B. GARLAND, Attorney General,

  Respondent.

)
)
)
)
)
)
)
)
)
)

**FILED**

Apr 21, 2023
DEBORAH S. HUNT, Clerk

ON PETITION FOR REVIEW
FROM THE BOARD OF
IMMIGRATION APPEALS

OPINION

Before: COOK, GRIFFIN, and NALBANDIAN, Circuit Judges.

**NALBANDIAN, Circuit Judge.** Basam Petros asks us to review the decision of the Board of Immigration Appeals ("BIA") ordering him removed to Iraq. Because the BIA's decision is supported by substantial evidence and contains no legal error, we deny his petition.

## I.

Basam Petros was born in Baghdad, Iraq, in 1972. He came to the United States as a refugee when he was nine years old and received lawful permanent resident status in 1983. But in 1994 he was convicted of second-degree murder in Michigan. So in June 1995 the Government served him with an order to show cause why he shouldn't be deported based on that conviction. An immigration judge ("IJ") entered an order of removal in 1997. Petros didn't appeal; but he remained in the United States for twenty years with annual check-ins with Immigration and Customs Enforcement ("ICE"). That changed in 2017 when ICE arrested Petros and took him into custody.

Petros filed a motion to reopen his removal proceedings in 2017 and applied for deferral of removal under Article III of the Convention Against Torture ("CAT") based on his status as a Chaldean Catholic and changed country conditions in Iraq. Although an IJ initially denied his motion to reopen, the BIA reversed in 2018, explaining that Petros had made out a case for changed country conditions in Iraq—including "a prima facie showing that government-backed militia forces ha[d] engaged in abuses against Christians." (A.R. 1726.)

On remand before the IJ, Petros marshaled hundreds of pages of evidence of country conditions in Iraq in support of his application for deferral of removal under CAT. He included declarations from Belkis Wille, Daniel Smith, Dr. Kiminori Nakamura, Rebecca Heller, Nina Shea, Mark Lattimer, and Dr. Shamiran Mako. On the other hand, the Government submitted declarations from Dr. Douglas Ollivant, Dr. Michael Rubin, and Dr. Denise Natali.

The IJ held a hearing with Petros alone testifying. Petros explained that because he left Iraq when he was so young and had not gone back since, he didn't have any connections in Iraq. He said that he was Catholic and that he had a tattoo of Jesus Christ on his right shoulder that went down to his elbow. And he said his Arabic was "not that good": he had "picked up little . . . pieces here, there" while in detention with other Iraqis and "in the neighborhood." (A.R. 987, 989.) But he spoke Chaldean—used only by Christians—"[b]etter than Arabic." (A.R. 989.)

Petros explained that he would have "nowhere" to go if he were removed to Iraq and that airport security in Iraq might think he is "a spy" with his "last name Petros." (A.R. 992.) He said that he "could be sold to the ISIS . . . because . . . they believe that . . . the Christians messed up their country."[1] (A.R. 992.) And on top of that, Petros thought that "because of [his] conviction,

---

[1] Petros said, "I heard, I heard it a lot on like internet, people talking, and you know, stuff like that and you could read messages from a lot like these Muslim people, like they type and stuff, they be

2

there's no doubt . . . [he] would be tortured or killed . . . [b]ecause their laws [are] a lot different." (A.R. 994.)

Neither the IJ nor the Government asked Petros any questions, and the IJ issued a written decision after the hearing. The IJ explained that to qualify for deferral of removal under the CAT Petros had to prove that he would "more likely than not" be tortured if removed. (A.R. 894 (citation omitted).) The IJ noted that he had to consider "all evidence relevant to the possibility of future torture" and that it was Petros's burden to demonstrate a "particularized threat of torture." (A.R. 894 (citation omitted).)

Although the IJ found that Petros was credible, the IJ accorded "[l]ittle weight . . . to [Petros's] testimony . . . given that he ha[d] been absent from Iraq for almost forty years since leaving as a child." (A.R. 895.) And the IJ found the declarations of the Government's experts more persuasive than those of Petros's witnesses. That's because the Government's experts "ha[d] been deemed experts in the past and . . . . ha[d] visited Iraq specifically for research within the past two years . . . . [and] [t]heir declarations [we]re more strongly corroborated by available country reports than those of [Petros's] declarants." (A.R. 896.) In contrast, the IJ declined to grant expert status to Rebecca Heller and Daniel Smith, two of Petros's witnesses. The IJ found that Heller had an interest in the litigation. And the IJ said that Smith's credentials established little more than a high school education.

Overall, the IJ explained, the "Government's evidentiary submissions demonstrate[d] the relative safety of Baghdad" and that "the threat of violence to individual returnees from" ISIS and militia units was "minimal."[2] (A.R. 901.) And the evidence Petros submitted "ha[d] not

---

like you guys Christians, you guys Christians, all Christians, Christians, Christians. And next thing you know you watch on TV, they beheaded a lot of Christians." (A.R. 993.)

[2] These militia units are known as the Popular Mobilization Forces ("PMF"). (A.R. 896, 1427.)

demonstrated that it [was] more likely than not that he w[ould] be tortured if he return[ed] to Iraq, nor that the Iraqi government would acquiesce to his torture. 8 C.F.R. § 1208.17." (A.R. 901.) The IJ then denied Petros's CAT claim and ordered him removed.

Petros appealed and also filed a motion to remand with the BIA. The BIA dismissed both in August 2021. In addressing Petros's claim that Daniel Smith and Rebecca Heller should have been qualified as expert witnesses rather than as percipient witnesses, the BIA explained that Petros had not demonstrated any prejudice since their statements "were admitted into evidence." (A.R. 341.) And even if these individuals had been qualified as experts in another case, the BIA explained, the other case was unpublished and had "no controlling or precedential effect on other cases." (A.R. 341.) Because the IJ had "provided reasoned consideration of the witnesses' qualifications" and there was "no clear error in his finding that their qualifications were insufficient to establish their expertise," the BIA declined to disturb the IJ's expert-qualification decisions. (A.R. 341.)

And the BIA found no clear error in the IJ's finding that it was "unlikely that [Petros] would be singled out for torture" based on his status as a Chaldean Christian or as a Westerner. (A.R. 342.) Contrary to Petros's argument, the BIA found that the IJ didn't commit clear error in weighing the evidence based on the record as a whole. So, the BIA held, Petros "ha[d] not met his burden to establish his eligibility for protection under the CAT." (A.R. 341.)

The BIA also denied Petros's motion to remand for the IJ "to consider additional evidence submitted during the pendency of this appeal." (A.R. 343.) The BIA explained that it wouldn't grant a motion to remand "unless it appear[ed] to the Board that the evidence sought to be offered [wa]s material and was not available . . . at the former hearing." (A.R. 343 (citing 8 C.F.R. § 1003.2(c)(1).) And, even then, the BIA would only grant the motion if the "new

evidence offered would likely change the result in the case." (A.R. 343 (citing *Matter of Coelho*, 20 I. & N. Dec. 464, 473 (BIA 1992).) While the evidence showed that there had been some ISIS attacks on Christians in Iraq, the BIA said that the evidence only established "risks that ha[d] existed under the prevailing country conditions." (A.R. 344.) Because this evidence and the other declarations submitted didn't establish that the outcome of Petros's case would change—i.e., that he would more likely than not "be singled out for torture in Iraq"—the BIA denied his motion to remand. (A.R. 344.)

Petros then filed a motion to reconsider and a motion to reopen in September 2021. On the motion to reconsider, Petros again argued that Smith and Heller should have been qualified as expert witnesses by pointing to a single unpublished decision where they had been qualified as expert witnesses, plus a published decision setting out general criteria for qualifying experts. And the BIA again explained that one unpublished decision qualifying the two as experts didn't amount to an affirmative reason why they should have been qualified as experts in this case. And in any event, the BIA found no prejudice.

Petros also argued that the BIA didn't adequately survey all the evidence in the case that pointed in his favor. But the BIA explained that the IJ took a permissible view based on all the evidence and that there was no clear error in the IJ's factfinding. Finally, Petros argued that other BIA and IJ decisions had granted relief to Iraqi Chaldean Christians, so his case should come out the same way. Because those cases were not precedential and every case has a unique set of facts, the BIA rejected this argument too.

The BIA also rejected Petros's motion to reopen. It noted that "[a] noncitizen seeking reopening based on newly submitted evidence must demonstrate that the evidence is new or was previously unavailable . . . [and] that if the proceedings were reopened . . . the newly submitted

evidence would likely change the result in the case." (A.R. 005. (citing 8 C.F.R. § 1003.2(c)(1); *Matter of Coelho*, 20 I. & N. Dec. at 472–73).) Petros offered his own updated declaration, unpublished BIA and IJ decisions, and human rights reports from 2020 and 2021 as his new evidence.

The BIA found that Petros had not established that his declaration was previously unavailable, and the unpublished agency decisions couldn't serve as evidence. The BIA acknowledged that some of the reports Petros proffered were new. But because his newly proffered evidence did not "set forth objective evidence showing a reasonable likelihood that he c[ould] establish that he [wa]s entitled to CAT protection," as a result of "a particularized risk of torture," the BIA denied the motion to reopen. (A.R. 006–07.) With the denial of his motion to reconsider and reopen, Petros timely appealed.[3]

## II.

When the Board issues its own opinion and adopts portions of the IJ's decision, we review the decisions of both the BIA and the IJ. *Hanna v. Holder*, 740 F.3d 379, 386 (6th Cir. 2014). We review the agency's legal conclusions de novo. *Ramaj v. Gonzales*, 466 F.3d 520, 527 (6th Cir. 2006). And we review an agency's factual findings for substantial evidence.[4] *See Nasrallah v. Barr*, 140 S. Ct. 1683, 1692 (2020); *Garland v. Ming Dai*, 141 S. Ct. 1669, 1677 (2021). That means those factual findings are "conclusive unless any reasonable adjudicator would be *compelled* to conclude to the contrary." *Yousif v. Garland*, 53 F.4th 928, 934 (6th Cir. 2022) (citation omitted). We review denials of motions to reopen, remand, and reconsider for an abuse

---

[3] Petros separately appealed the BIA's dismissal of his petition, Case No. 21-3826, and the BIA's denial of his motion for reconsideration and motion to reopen, Case No. 22-3731. We address both appeals in this consolidated opinion.

[4] The BIA reviews the IJ's factual findings for clear error. *Matter of Z-Z-O-*, 26 I. & N. Dec. 586, 589–91 (BIA 2015).

of discretion. *See Guzman-Torralva v. Garland*, 22 F.4th 617, 620 (6th Cir. 2022) (motion to reopen); *Sarr v. Gonzales*, 485 F.3d 354, 363 (6th Cir. 2007) (motion to remand); *Yeremin v. Holder*, 738 F.3d 708, 718 (6th Cir. 2013) (motion to reconsider).

## III.

First, Petros challenges the IJ's factfinding on what would happen to him if he were removed to Iraq. Then, he presents four legal challenges to the decisions of the BIA. We'll address each in turn.

## A.

First, the IJ's factfinding—which we review for substantial evidence. *See Nasrallah*, 140 S. Ct. at 1692. Because Petros applied for deferral of removal under CAT, he had to show that "it [wa]s more likely than not that he . . . [personally] would be tortured" if removed to Iraq. 8 C.F.R § 1208.16(c)(2); *Matter of S-V-*, 22 I. & N. Dec. 1306, 1311 (BIA 2000).

Petros challenges four of the IJ's factual determinations: (1) ISIS's withdrawal presents a diminished threat from both the Iraqi government and ISIS to those who return; (2) Petros's fear of torture by militia units is lessened because the war with ISIS has ended and anti-American attitudes have decreased; (3) Petros has not demonstrated that the Iraqi government would acquiesce to his torture; and (4) Petros didn't establish that he couldn't relocate within Iraq.

But there was substantial evidence in the record that Petros's status as a Christian, who had been convicted of a crime in the United States, didn't put him at risk of torture—and the IJ reasonably relied on that evidence. For instance, Dr. Natali, an expert for the Government, explained that although there were "isolated incidents of violence, those that have returned have not suffered mass atrocities and do not face the risk of harm they once did." (A.R. 897.) She said that "Iraq is home to vulnerable religious and ethnic minorities facing many post-liberation

7

challenges" but that these challenges "do not translate into an appreciable risk of persecution or torture." (A.R. 1371.) And while Christians formerly faced persecution in Iraq, they now were able to "rebuild their homes, and their villages and towns and [we]re often protected by Christian and Yezidi militias." (A.R. 898, 1373.) For instance, "over 7 million people reside in the capital city of Baghdad, and that population includes Christian, Assyrian, Armenian and Yezidi communities." (A.R. 1373.) And she noted that "[m]any militias have mixed membership that cross ethnic, religious, and political lines." (A.R. 1356.)

And Dr. Rubin, another of the Government's experts, explained that because so many Iraqis who fled to other places have returned, their presence is "normalized." (A.R. 1418.) Because of this familiarity with people returning, the Iraqi government has procedures in place, Dr. Rubin said, to screen returnees. Dr. Rubin also noted that Iraq's government has "worked to secure Christian churches and Christian neighborhoods." (A.R. 1422.) These measures reflect "[g]rowing professionalism within the government." (A.R. 1356.) That professionalism was also evidenced, he said, by the fact that the "Iraqi government ha[d] cracked down on [militia group] excesses and investigated crimes, and has begun to prosecute abuses." (A.R. 1357.) And on the score of Petros's conviction, Dr. Rubin explained that "Iraq generally has neither the resources nor will to prosecute crimes committed outside Iraq's borders." (A.R. 1419.)

Dr. Ollivant, the third Government expert, also explained that he didn't know of any "incidents of Iraqi citizens being tortured for not having proper documents or because of their criminal history in the United States." (A.R. 1449.) Instead, the Iraqi government had only sought to verify their identity before allowing them to continue into the country. And Dr. Ollivant said that the fact that Iraqi Christians had been Westernized "makes them almost certainly innocent of any ISIS connection, which will be the primary concern of Iraqi authorities receiving them."

(A.R. 1358.) And he explained that Christians could "move to a location secured by an Iraqi Christian militia," which would "provide 'insurance' against persecution by any remnants of ISIS that might be able to act in northern Iraq." (A.R. 1427.)

The Government's experts explained that Christian militia units in Iraq were closely aligned with the Iraqi government and helped, not hurt, Christian communities by guarding them against ISIS. (A.R. 1427, 1435–36.) Many of the militia units were "formally incorporated into the Government of Iraq," and militia "officials at the highest level ha[d] expressed affinity with Iraq's Christians." (A.R. 1429.) Moreover, "most [militia groups] ha[d] subordinated themselves to central control." (A.R. 1436.) So the Government provided evidence that Petros would not personally be at risk of any torture upon return to Iraq based on his status as a Christian and felon.

Petros's experts painted a different picture. For instance, Shea explained that "ISIS remains a serious threat to Christians" and that "Christian deportees would be vulnerable to targeted ISIS attacks." (A.R. 2122.) Dr. Mako said that "Christian communities are even more vulnerable" than others in Iraq because of "[c]lashes between paramilitary groups fighting for control of the Nineveh plains." (A.R. 1888.) And Petros explained that militia units are strengthened by the fact that they now align with the Iraqi government and therefore can commit torture with impunity. But, after reviewing the proffered declarations, the IJ said that Petros's evidence "amount[ed] to sporadic terrorist attacks against the population at large—not a particularized threat of torture against respondent." (A.R. 897.)

So the question for us is whether the evidence in the record "compels" Petros's desired factual findings. *Yousif*, 53 F.4th at 935. The IJ's factual determinations are based on the plethora

of evidence the Government provided. So we aren't compelled to find that Petros would face torture if he returned to Iraq.[5]

**B.**

Next, Petros makes four legal arguments. He says that the BIA applied the wrong standard of review in its first decision, erred in upholding the IJ's expert determinations, failed to articulate a rationale in denying the motion to remand, and erred in denying his motion to reopen. We'll take each of these contentions in turn.

**1.**

*Standard of Review.* Petros argues that the BIA's first decision applied clear-error review when it should have reviewed de novo. Petros admits that the BIA reviews an IJ's findings of fact for clear error and that whether Petros would "face detention, interrogation, and/or abuse if returned to Iraq" is a question of fact. *See* 8 C.F.R. § 1003.1(d)(3)(i); (Pet'r. Br. at 33.). But Petros argues that whether "those amount to torture" is a question of law that should be reviewed de novo. (Pet'r. Br. at 33.) So, Petros says, the BIA erred when it applied clear error to whether the acts described in Iraq "amount to torture." (Pet'r. Br. at 33.)

But the BIA never analyzed whether all the conditions in Iraq would amount to torture. Instead, the BIA held that, based on the facts as found by the IJ, Petros had not shown a *particularized risk* of torture—a factual claim the BIA reviews for clear error. *See Matter of Z-Z-O-*, 26 I. & N. Dec. at 590 ("[A]n Immigration Judge's predictive findings of what may or may

---

[5] And even if we credited all Petros's evidence about conditions in Iraq, he still hasn't demonstrated a particularized risk of torture. Petros's "expressed fears of various security forces in his briefing does not establish a particularized threat" and his evidence doesn't show that "it is more likely than not that [Petros] himself would be tortured within the meaning of CAT." *Yousif*, 53 F.4th at 937 (cleaned up); *see also Hanna*, 335 F. App'x at 551 ("Such a generalized or random possibility of harm in the country of removal is insufficient to establish a fear, or a pattern or practice of persecution.").

not occur in the future are findings of fact, which are subject to a clearly erroneous standard of review."); *Marqus v. Barr*, 968 F.3d 583, 590 (6th Cir. 2020) ("[T]he BIA decided that the IJ did not clearly err in finding that Marqus could not show a particularized threat of torture."). So Petros's standard-of-review argument fails.

**2.**

*Expert Witnesses.* Petros takes issue with two aspects of the agency's expert determinations. First, Petros argues that the BIA erred in its initial denial of Petros's claim and in its ruling on the motion for reconsideration by upholding the IJ's view that the Government's declarants were more qualified than his. Second, he argues that the BIA erred in its initial denial and in its ruling on the motion for reconsideration by upholding the IJ's determination that Daniel Smith and Rebeca Heller weren't qualified as expert witnesses.

The Government's experts were Dr. Denise Natali, Dr. Michael Rubin, and Dr. Douglas Ollivant. The IJ found them more persuasive than Petros's declarants—Belkis Wille, Daniel Smith, Dr. Kiminori Nakamura, Rebecca Heller, Nina Shea, Mark Lattimer, and Dr. Shamiran Mako—because of their "first-hand knowledge of and experiences in Iraq" and the fact that "[a]ll three ha[d] visited Iraq specifically for research within the past two years." (A.R. 896.)

Petros argues that his proposed experts are "every bit as qualified" as the Government's based on their various credentials. (Pet'r. Br. at 39.) We review the agency's factfinding here for substantial evidence. *Nasrallah*, 140 S. Ct. at 1692. So we'd only disturb the BIA's decision if "any reasonable adjudicator would be compelled to conclude to the contrary." *Id.*

And that's not the case here. As the BIA explained, the IJ "provided reasoned consideration of the witnesses' qualifications." (A.R. 341.) And "the opinions offered by the witnesses for the [Government] [we]re largely based on field research conducted in Iraq" as

opposed to general research. (A.R. 341.) So the IJ's finding that the Government's experts were more qualified is supported by substantial evidence.

On the second argument, Petros makes no affirmative argument that Smith and Heller should have been qualified as experts. Instead, he points to an unpublished BIA decision and an unpublished IJ decision where the two were admitted as experts to say that they must be admitted as experts here too. (Pet'r. Br. at 42.) We typically review evidentiary rulings in an immigration proceeding only for "violation[s] of due process." *Singh v. Ashcroft*, 398 F.3d 396, 407 (6th Cir. 2005). Petros did not brief how the determination of expert qualifications would violate due process.

From our perspective and like the BIA explained, unpublished decisions aren't binding on the BIA, and, in any event, Petros failed to establish that there was any prejudice for failure to qualify them as experts.[6] The IJ still considered their declarations against those of the Government. Thus, we can't say—based on unpublished agency cases alone—that there was any due-process violation here.[7] Since Petros points to no other support for his argument that Smith and Heller should have been qualified as experts, we see no error in the BIA's initial decision or abuse of discretion in its ruling on the motion for reconsideration.

---

[6] The point of Petros's argument here seems to be that he wanted the IJ to place more weight on the opinions of Smith and Heller. But in the face of plentiful evidence from the Government, it's the IJ's job to "consider how much weight [the testimony] should receive," not ours. *Matter of J-G-T-*, 28 I. & N. Dec. 97, 101 (BIA 2020); *Marqus*, 968 F.3d at 589 ("Because [petitioner's] arguments merely ask us to reweigh the evidence, and the Government has introduced its own credible body of evidence to the contrary, we defer to the IJ's factual findings on this record.").

[7] And even if Petros had made an affirmative argument that Smith and Heller should have been qualified as expert witnesses, the IJ explained why Smith and Heller weren't qualified. Smith's credentials didn't establish anything beyond a high school diploma to qualify him to speak about conditions in Iraq. And while Heller is an attorney, her credentials didn't establish that she had any background in predictive analysis on country conditions. On top of that, the IJ found that she had an interest in the litigation. Petros does not seek review of any of these underlying findings.

**3.**

*Motion to Remand.* Next, Petros finds fault with how the BIA evaluated the evidence in his motion to remand. He says that "the IJ relies almost exclusively on a single government expert declarant, Ms. Denise Natali." (Pet'r. Br. at 34.) But, he says, the new evidence he submitted in support of his motion to remand "undermines and refutes" the IJ's factual determinations. (*Id.*) And he argues that in dismissing the evidence as cumulative, the BIA ran afoul of our precedent that "require[s] the BIA to adequately explain why Petros' new evidence regarding the [militia units] did not reflect a material change in the likelihood of him being tortured upon a forced return to Iraq." (*Id.* at 35.)

In reviewing the denial of a motion to remand for an abuse of discretion, we won't disturb the BIA's decision unless it is "without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis." *Sarr*, 485 F.3d at 363 (citation omitted). Under the relevant regulations, the BIA "shall not [] grant[]" a motion to remand unless the "evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing." 8 C.F.R. § 1003.2(c)(1); *see Marqus*, 968 F.3d at 592 (applying 8 C.F.R. § 1003.2(c)(1), the motion-to-reopen provision, to a motion to remand). And the petitioner must show that the evidence would likely change the result of the case. *Matter of Coelho*, 20 I. & N. Dec. at 473.

The BIA noted that Petros's new evidence included "submitted statements by United States government officials, reports about current conditions in Iraq, unpublished decisions from this Board, and voluminous news articles depicting events occurring in Iraq subsequent to the final hearing." (A.R. 343.) The problem, the BIA explained, was that the evidence established what had already been given to the IJ—the "existence of ongoing sectarian strife in Iraq and the fact

that Christian communities still have lingering fears of ISIS." (A.R. 343.) And the BIA said that the new evidence still failed to demonstrate a particularized risk of torture.

In all of this, the BIA provided a rational explanation for its decision based on both its precedent and the relevant regulation governing motions to remand. Petros faults the brevity of the BIA's analysis. But the BIA provided an in-depth analysis of the new evidence and why it still failed to show a particularized risk. *See Preçetaj v. Sessions*, 907 F.3d 453, 459 (6th Cir. 2018) (remanding to the BIA where the BIA did not "analyze and explain the basis on which it decides against a petitioner" (citation omitted)). That's all we ask for. So we decline to disturb the BIA's denial of this motion because it did articulate a rationale for its denial.

**4.**

*Motion to Reopen.* Next, Petros argues that the BIA erred in its second decision denying his motion to reopen based on changed country conditions. The BIA denied the motion to reopen for essentially the same reason that it denied Petros's motion to remand—Petros's new evidence was cumulative of the old evidence he had presented to the IJ. *See* 8 C.F.R. § 1003.2(c)(1).

Petros submitted a new personal declaration. But the BIA said that Petros had not shown that the declaration would have been unavailable when he was before the IJ. Petros also submitted an unpublished IJ and BIA decision—neither of which constitute evidence. In addition, he attached updated country-condition reports from the State Department and other organizations. Petros argues that the 2020 and 2021 State Department Reports establish that militia groups, backed by the Iraqi government, tortured individuals. (Pet'r. Br. at 37.) And since these developments were not in the 2016 and 2017 reports that were before the IJ, Petros argues that reopening was warranted on this ground too.

But all this new evidence, the BIA held, only "show[ed] that there continues to be ongoing sectarian strife and violence in Iraq, Christian communities continue to face difficulties in Iraq, and that abuses have been committed by Iraqi security forces and militias." (A.R. 006.) And ultimately the BIA determined that "[t]he evidence submitted . . . d[id] not reflect that any persecutor or Iraqi official would specifically intend to inflict severe pain or suffering on the respondent." (A.R. 006.)

Again, we review motions to reopen for abuse of discretion. *See Guzman-Torralva*, 22 F.4th at 620. And the BIA has broad discretion to deny these motions. *See id.* The BIA didn't abuse its discretion in denying the motion to reopen because all the evidence Petros points to as warranting reopening of his case goes to problems in Iraq generally, not his particularized risk of torture.[8] We see no abuse of discretion here.

**IV.**

For these reasons, we deny Petros's petition for review.

---

[8] Petros says that the BIA should have placed greater weight on reports from the Department of State because "State Department reports are generally the best gauge of conditions in foreign countries." (Pet'r. Br. at 36 (citing *Dieng v. Holder*, 698 F.3d 866, 872 (6th Cir. 2012)).) But the BIA did consider those reports for determining what conditions existed in Iraq. And still, it found that Petros didn't establish a particularized risk of torture—a finding we won't disturb here.